UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANDREW CABALLERO,

                         Petitioner,

          – against –

CHRISTOPHER MILLER,
Warden/Superintendent Comstock
Correctional Facility

                         Respondent.

**MEMORANDUM & ORDER**

18-cv-5108 (ERK) (LB)

KORMAN, *J*.:

     This petition arises from a cold case.  In 1995, Jason Kollman died after he was stabbed fifteen times on the rooftop of a Queens apartment building, dumped onto a fire escape, and left to bleed out.  At the time, police were unable to identify a culprit.  A reinvestigation in 2003 also failed to produce any arrests.  In 2011, detectives on the Cold Case Squad reopened the case for a second time and reinterviewed leads from 1995.  The police also located a new witness who claimed, for the first time, to have witnessed Andrew Caballero attack Mr. Kollman on the roof shortly before he was discovered on the fire escape.

     In 2014, almost two decades after Mr. Kollman's death, Mr. Caballero was convicted of second-degree murder after a jury trial in Queens County Supreme

Court.  The Appellate Division affirmed his conviction on direct appeal, and the Court of Appeals denied his application for leave to appeal.  *People v. Caballero*, 137 A.D.3d 929, 929 (2d Dep't 2016); *People v. Caballero*, 28 N.Y.3d 927, 927 (2016).[1]  Mr. Caballero then filed a pro se petition for coram nobis relief, contending that he had been deprived of effective assistance of appellate counsel in violation of his Sixth Amendment rights because his appellate counsel had failed to challenge the effectiveness of his trial counsel.  App'x A1196, A1200.  The Appellate Division denied the petition, and the Court of Appeals again denied his application for leave to appeal.  *People v. Caballero*, 157 A.D.3d 812, 812 (2d Dep't 2018); *People v. Caballero*, 31 N.Y.3d 1146, 1146 (2018).  In 2018, Mr. Caballero filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  I appointed counsel to represent him in these proceedings.  In 2021, I stayed the petition and held it in abeyance while Mr. Caballero pursued a motion to vacate his conviction in Queens County Supreme Court, arguing that he received ineffective assistance from his trial counsel.  The Queens County Supreme Court denied the motion, and the Appellate Division denied leave to appeal.  App'x B681–96, B2679.

---

[1] Unless otherwise indicated, all internal quotation marks, citations, alteration marks, emphases, and footnotes are omitted from case citations.

## FACTUAL AND PROCEDURAL HISTORY

On the evening of February 1, 1995, police and emergency medical services responded to a 911 call from a resident of 43-43 Kissena Boulevard in Flushing, Queens, who reported hearing someone moaning and begging for help.  Responders found Mr. Kollman seriously wounded and bleeding on a fifth-floor fire escape, where they unsuccessfully tried to revive him.  Mr. Kollman had been stabbed fifteen times in the chest, neck, back, and torso, penetrating his lungs, liver, and blood vessels.  The murder weapon was never recovered.

The first police investigation first took place in 1995 and was inconclusive. The second, in 2003, also failed to yield any arrests.  In 2011, a Cold Case squad detective learned from a former colleague that Mr. Kollman's murder remained unsolved.  App'x A562.  Detectives from the Cold Case squad reopened the case and reinterviewed several of the witnesses.  They also interviewed a new witness, Oscar Balarezo, who claimed that he had been on the roof with Mr. Caballero and Mr. Kollman in 1995.  Mr. Balarezo told police that he had seen Mr. Caballero get into an altercation with Mr. Kollman and then come downstairs covered in blood. Mr. Balarezo also claimed that, later that same night, Mr. Caballero told him that he had stabbed Mr. Kollman on the rooftop.

## Criminal Proceedings

### a. Pre-Trial Proceedings

Mr. Caballero was arrested in April 2012 and indicted for murder in the second degree under New York Penal Law § 125.25(1). Over the next two years, Mr. Caballero made several appearances in Queens County Criminal Court. *See* App'x A1–28. At these appearances, Mr. Caballero's trial counsel, Robert DiDio, repeatedly pushed for the case to move forward as quickly as possible, citing Mr. Caballero's continued incarceration. *See*, *e.g.*, *id.* at A8.

On July 21, 2014, just prior to trial, Mr. Caballero rejected a plea of manslaughter in the first degree carrying a sentence of 22 years. App'x A30. At that hearing, the prosecutor indicated that—pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961), which requires a New York prosecutor to turn over all prior recorded material statements of a witness he or she intends to call at trial—she had turned over all relevant witness materials, with the exception of a report of the medical examiner that was known to Mr. Caballero's trial counsel. *Id.* at A35. Mr. Caballero's trial counsel informed the court that he did not plan to call any additional witnesses. *Id.* The prosecutor also moved *in limine* to admit the hearsay testimony of Nadia Sierra, Mr. Caballero's former girlfriend, about a purported excited utterance by Mr. Balarezo. *Id.* at A35–38. Ms. Sierra planned to testify that shortly

4

after Mr. Balarezo left the roof, and presumably while he was still under the startling influence of witnessing the altercation between Mr. Caballero and Mr. Kollman, she heard Mr. Balarezo exclaim excitedly, "He killed him.  He killed him.  I can't believe he killed him," and when she asked who had been killed, Mr. Balarezo clarified, "He killed Jason." *Id.* at A37.  The court reserved judgment on the motion and adjourned to give Mr. Caballero's trial counsel time to review the *Rosario* materials.  *Id.* at A38.

The following day, Mr. Caballero's trial counsel asked the court for a one-day continuance in order to prepare an argument for a longer adjournment.  App'x A41.  He explained that he needed two to four weeks "to conduct a proper investigation based upon the materials that have been recently turned over," including information about Mr. Balarezo and Ms. Sierra.  *Id.*

The prosecutor opposed any adjournment, arguing that *Rosario* material on most of the witnesses had been turned over six weeks earlier, giving Mr. Caballero's trial counsel ample time to investigate.   App'x A42–43.  As an example, the prosecutor stated that she had turned over information about one witness, Mike Lugo, on May 31.  Witnesses were expected to testify that Mr. Lugo had gotten into a fight with Mr. Kollman in front of a deli near 43-43 Kissena about 45 minutes before Mr. Kollman was killed and that Mr. Caballero had broken it up.  The

prosecutor explained that she "even went so far as to tell [Mr. Caballero's trial counsel], listen, I have contact with Mike Lugo, he is on my witness list, if it is an issue at trial if you want me to make him available to you, I will." *Id.* at A43.  The prosecutor also told the court that she had concerns about the safety of Mr. Balarezo and Ms. Sierra and indicated that she had only turned over information on them because the case was marked as ready.  *Id.*

At the next day's hearing, Mr. Caballero's trial counsel made his case for a longer adjournment to allow time for investigation.  He confirmed that the *Rosario* material for most of the witnesses had been delivered "in May and early June." App'x A51.  The argument for adjournment focused on the fact that the prosecutor had not turned over *Rosario* material on Mr. Balarezo and Ms. Sierra until immediately before trial.  *Id.* at A49–51.  He contended that there simply was not enough time to properly review the *Rosario* material and prepare to cross-examine these two witnesses.  *Id.* at A52.

The court pointed out that Mr. Caballero's trial counsel had been working on the case for almost two years and that both Mr. Balarezo and Ms. Sierra were well-known to Mr. Caballero.  App'x A52.  Indeed, Mr. Caballero had mentioned both of these witnesses in his statements to police, and Mr. Caballero's trial counsel had originally viewed them as potential alibi witnesses. *Id.* at A52–53. Despite this, Mr.

6

Caballero's trial counsel had not made any attempts to interview the witnesses since he took over the case.  He claimed that the "prior attorney with an investigator tried to reach out to those two witnesses and they were uncooperative with us."  *Id.* at A53.  The court responded:

> You are making my point though . . . this is not a stranger case. . . .  The whole investigation or large parts of the investigation . . . are people that your client knows. . . .  It is the nature of being a defense lawyer in New York . . . that investigations have got to be kind of intuitive and they also have to be, you know, with the aid of the best asset you have, which is your client.

*Id.* at A53–55.

Prompted to identify specific ways in which denying an adjournment would impair his ability to prepare a defense, Mr. Caballero's trial counsel pointed to Mr. Lugo.  App'x A57.  Trial counsel explained that he could use Mr. Lugo's testimony about the fight to contradict Mr. Balarezo's timeline and undermine his credibility, but that he needed "to get in touch" with Mr. Lugo by having an investigator locate him and possibly serve him a subpoena.  *Id.* at A58.  The prosecutor responded that information on Mr. Lugo had been turned over six weeks earlier, that Mr. Caballero's trial counsel had not taken the prosecutor up on her offer to make Mr. Lugo available, and that Mr. Lugo was not acquainted with Mr. Balarezo and therefore could not testify to whether he had been present at the fight.  *Id.* at A59.  The prosecutor told the court that the only way Mr. Lugo's testimony would be

"relevant is if the defense is going to try to blame Mike Lugo [for the murder]." *Id.* Mr. Caballero's trial counsel claimed that he had no recollection of the prosecution's offer to make Mr. Lugo available. *Id.* at A60.

Mr. Caballero's trial counsel continued to press the importance of Mr. Lugo with the judge. He claimed that Mr. Lugo's statements indicated that Mr. Kollman had entered 43-43 Kissena with an individual other than Mr. Balarezo. App'x A60–61. The court noted that the prosecutor had offered to produce Mr. Lugo if he was willing to talk and directed Mr. Caballero's trial counsel to move on to the next issue. *Id.* at A62. Trial counsel indicated that he wanted to interview Javier Peralta, who had stated that Mr. Lugo, not Mr. Balarezo, had entered 43-43 Kissena with Mr. Kollman on the night of his death. *Id.* at A63. The court pointed out that information on Mr. Peralta had been turned over in May, giving Mr. Caballero's trial counsel time to investigate prior to trial, leading to the following exchange:

> THE COURT:  When did you have him?  Is this all brand new or two months?
> [DEFENSE]:  No, this was turned over May 31.
> [PROSECUTION]:  May 29.
> THE COURT:  So.
> [DEFENSE]:  But Judge, again.
> THE COURT:  Not Judge again.  You had it for two months.
> [DEFENSE]:  But I didn't know that the People's witness, [Mr. Balarezo], was going to say that he was the person that entered 43-43 [Kissena].
> THE COURT:  So you didn't even bother interviewing this guy.

*Id.*

The prosecutor responded that Mr. Peralta's statements were "unsubstantiated hearsay" that he had repeated to detectives.  App'x A63.  Mr. Caballero's trial counsel countered, "I couldn't know that [Mr. Peralta's statements were hearsay] until I spoke to the witness." *Id.* at A64.  The court responded, "You didn't know it was hearsay because you didn't ask him." *Id.*  Mr. Caballero's trial counsel also raised the possibility of calling another witness, Monique Moses, to contradict parts of Ms. Sierra's testimony. *Id.* at A66.

The court denied the application for an adjournment.  It explained that "a significant part of this material has been provided to [Mr. Caballero's trial counsel] for two months" and that counsel had been on the case for "the better part of two years."  App'x A69.  Concerning Ms. Sierra and Mr. Balarezo, the court said, "I question how these people can be a complete shock to you . . . we are at the midnight hour here. . . .  I will repeat, [these witnesses] are the—at the time, girlfriend of your client and the pal of your client in 1995.  I mean, I don't really see it." *Id.* at A69, A71.  None of the witnesses discussed at the hearing, other than Ms. Sierra and Mr. Balarezo, ultimately testified at trial.

Mr. Caballero's trial counsel also argued that he had not been given access to evidence referenced in the *Rosario* materials.  Specifically, he pointed out one of the

DD5s indicated that a "subject of interest" had told the police that Mr. Lugo had "called [Mr. Kollman's] home and left a threatening message on an answering machine."[2] App'x A79. The prosecutor responded that a search for the tape had come up empty and that she had turned over a document indicating that it had been deleted by communications staff. *See id.* at A80–81. She also explained that Mr. Kollman's mother had told her that the person who left the message did not give any names. *See id.* at A80. She argued that the tape was irrelevant to the case anyway, "[u]nless the defense is blaming Mike Lugo of some sort." *Id.* at A81. The record does not disclose any further discussion of the issue, and the case proceeded to trial.

As relevant here, at trial, Mr. Caballero's trial counsel sought to put problems with *Rosario* materials in the record. During a sidebar, he pointed out that the DD5s turned over by the prosecutor were not numbered, making it impossible to tell whether any were missing from the file. *See* App'x A352–53. The prosecutor responded that she had turned over all materials and had not provided DD5s from the 1995 investigation "because they don't exist." *Id.* at A359. She explained, "This is a cold case. It is from 1995. DD5s were not computerized back then so everything

---

[2] A "DD5" is a type of written report police officers use to memorialize actions taken during an investigation.

that was in the [detective's] file as far as DD5s I turned over to counsel, irregardless [sic] of whether they were Rosario or not." *Id.* at A358–59.

### b. The Trial

Mr. Caballero's trial took place over eight days in July 2014.

#### i.   The Opening

In her opening, the prosecutor told the jury that Mr. Caballero "was angry" and stabbed Mr. Kollman because he "owed [Mr. Caballero] some money." App'x A376–77.  She said that Ms. Sierra would testify that Mr. Caballero told her that he did not stop stabbing Mr. Kollman because "he wanted to feel what it would be like to kill somebody." *Id.* at A379.

The prosecutor noted that Mr. Balarezo had waited almost 20 years to say anything to police about being on the roof with Mr. Caballero and Mr. Kollman, explaining, "In 1995 he was . . . [a] kid, not a grown man.  Twenty years later life is different, things are different.  He is more mature.  He has a family.  He has children.  He has a son.  And those things change a person." App'x A381.  She acknowledged that there was "no scientific evidence in this particular case linking [Mr. Caballero] to the homicide."  *Id.*  But she told the jury that by the end of the case, "[Y]ou will have no doubt that these witnesses are telling you the truth.  You will have no doubt

that on February 1 of 1995 [Mr. Caballero] took the life of 21 year old Jason Kollman for money, to see what it would feel like." *Id.* at A382.

In his opening statement, Mr. Caballero's trial counsel, without specifically addressing the evidence, emphasized the jury's responsibility to make credibility determinations and weigh the evidence in light of the presumption of innocence. *See* App'x 385–89. He told the jury that "once you hear the testimony and the inconsistent statements and the explanations they give for why they didn't come forward, you are going to have a reasonable doubt." *Id.* at A388.

### ii. Witness Testimony

A total of eight witnesses testified for the state during the trial, and their testimony is summarized below. Mr. Caballero's trial counsel cross-examined several of these witnesses but did not call any additional witnesses. Mr. Caballero did not testify on his own behalf.

### A. Ahmad Muhammad Jalil

The first witness, Ahmad Muhammad Jalil, was the person who alerted the police on the night of Mr. Kollman's death. He testified that around 8:00 PM he heard a "big boom . . . on the roof," followed 20 minutes later by "two gunshots." App'x A392. When he went to the bedroom to investigate, he heard someone calling for help. *Id.* Shortly after, he called the police. *Id.* at A393. Later that night, police

removed the body while officers took interviews until "3:00 or 4:00 in the morning." *Id.* at A394.   On cross-examination, Mr. Caballero's trial counsel asked several questions about the layout of the stairwell and elevator at 43-43 Kissena. *See id.* at A395–97.

### B.   Oscar Balarezo

Mr. Balarezo took the stand next.  He testified that he had met Mr. Caballero about "six months to a year" prior to the night of Mr. Kollman's death.  App'x A403. On February 1, 1995, Mr. Balarezo visited Mr. Caballero at Ms. Sierra's first-floor apartment "in the evening time," where he first met Mr. Kollman.[3]  *Id.* at A403–04. The three men went to the roof to "smoke some weed" because it was Mr. Balarezo's "birthday weekend."[4]  *Id.*  As Mr. Balarezo began to "spark up" his "clip" of marijuana, Mr. Caballero "walked away, off with [Mr. Kollman]" and "asked to talk with him." *Id.* at A405.  Mr. Balarezo testified that Mr. Caballero and Mr. Kollman were "approximately maybe like anywhere from like 10 to 15, 25 feet away from me." *Id.*  Mr. Balarezo heard "something about money" before Mr. Caballero started "going towards" Mr. Kollman.  *Id.*  Mr. Caballero then "started swinging on" Mr.

---

[3] Ms. Sierra is sometimes referred to by her middle name—Gina—in the transcripts, especially by Mr. Balarezo. *See* App'x A601.

[4] As Mr. Caballero's habeas counsel notes, February 1, 1995 fell on a Wednesday, not a weekend.

Kollman, though it was too dark for Mr. Balarezo to "see whether he connected at all." *Id.* at A406. He was also unable to see whether Mr. Caballero was holding a knife or other weapon. *Id.* at A409. Mr. Balarezo saw Mr. Caballero swing "more than one time." *Id.* at A406. Mr. Kollman began "backing up" and saying "ah, ah, ah" and "stop." *Id.* Mr. Balarezo said that he was on the rooftop, witnessing these events, for "maybe like a minute or two" and that he had never gotten close to either Mr. Caballero or Mr. Kollman during that time. *Id.* at A407.

At this point, Mr. Balarezo "chose to leave" the rooftop and "ran downstairs" to the lobby. App'x A407–08. Mr. Balarezo then asked himself, "why am I running for," and he went back upstairs to the first floor. *Id.* at A408. On the first floor, "the elevator opened up," and Mr. Balarezo saw Mr. Caballero standing inside "drenched in blood . . . [a]ll over his chest and hands." *Id.* Mr. Balarezo "asked [Mr. Caballero] what had happened, what is going on," but Mr. Caballero "refused to say anything" and instead returned to Ms. Sierra's apartment. *Id.* Mr. Balarezo did not recall seeing anyone else present when Mr. Caballero appeared in the elevator. *Id.* at A411, A487–88, A493.

Mr. Balarezo followed Mr. Caballero to Ms. Sierra's apartment and continued to press him about what had happened, but eventually he "decided to leave" when "nobody answered [him]." App'x A409. Mr. Balarezo flagged down a cab and,

14

after he got in, he saw Mr. Caballero "jump in the cab too." *Id.* Mr. Balarezo again asked what was going on, and Mr. Caballero again declined to say anything. *Id.* Mr. Caballero "had his hand over his mouth because it seemed like he wanted to throw up." *Id.* The cab pulled over near Hoffman Park, where Mr. Caballero exited the cab, threw up, and told Mr. Balarezo "that he had stabbed" Mr. Kollman. *Id.* at A409–10. Mr. Balarezo then left on foot and went home. *Id.* at A410.

Mr. Balarezo testified that at some point after the incident, Mr. Caballero "got in touch" with him, though he could not recall whether it was in person or by phone. App'x A411. During that conversation, Mr. Caballero told Mr. Balarezo that "he basically . . . dragged [Mr. Kollman] and tried to throw him off the roof." *Id.* Mr. Caballero also told Mr. Balarezo "not to tell anybody" what had happened and "[t]o keep it to [himself]." *Id.* at A412. Mr. Balarezo did not tell anyone about what had happened until police interviewed him during the cold case investigation more than 15 years later. *See id.*

Mr. Balarezo claimed that he did not come forward in 1995 because "[b]ack then I would have been considered a snitch and I don't believe in snitching." App'x A413. He explained that when police came to talk to him in 2011, he felt, "I am a man now. . . . I have a family and if something like that was done to my kid, I wouldn't stand for that." *Id.*

Mr. Balarezo acknowledged that he continued to see Mr. Caballero after the incident because they "were in the same circle" of friends and there was "a tie in-between all of us." App'x A413–14. Mr. Balarezo "hung out" with Mr. Caballero when they were both going through "down time" in their respective relationships. *Id.* at A414. Mr. Balarezo also acknowledged that, when they came to interview him in 2011, detectives alerted him to an open warrant for his arrest, which Mr. Balarezo resolved shortly afterward by pleading guilty to a misdemeanor related to tampering with a license plate and paying a fine. *Id.* at A415–16.

On cross-examination, Mr. Caballero's trial counsel sought to undermine Mr. Balarezo's credibility. He initially denied having moved to Florida after 1995 but later changed his answer. *See* App'x A426–27. While pursuing this line of questioning, trial counsel had the following exchange with the court:

> [DEFENSE]: When was the first time that you moved to Florida after February 1 [1995]?
> [Mr. Balarezo]: I do not remember, sir.
> [DEFENSE]: You have to let me finish my question because the reporter has to take everything down, and I ask you to speak as loud as you can.
> THE COURT: And I'm going to ask you not to admonish the witness. If you have questions, ask them.
> [DEFENSE]: Judge, he is speaking over me. I wasn't finished with my question, and he was answering.
> THE COURT: I'm going to repeat myself. If there is admonishment to be done, I will do it, not you.

*Id.* at A427–28.

Mr. Balarezo denied ever moving to Kansas City, which contradicted notes taken by one of the cold case investigators. *See* App'x A429. He acknowledged that at points between 1995 and 2011, he socialized with Mr. Caballero by going to the gym with him. *Id.* at A431. Mr. Balarezo said that he went to the gym with Mr. Caballero "[q]uite a few times . . . [m]aybe twice, three times a week depending on work and family" and that they were "workout partners" for "a couple of months." *Id.* at A431–32. In addition to working out, the two socialized by "get[ting] a bite to eat with a couple of friends, or . . . hav[ing] a drink or two." *Id.* at A432. Mr. Balarezo also acknowledged that he did "one side job" with Mr. Caballero removing wallpaper for someone, and he also helped Mr. Caballero get a job as a driver for a concrete company by letting him know the company was looking. *See id.* at A433–35. Mr. Balarezo also testified that he had visited Mr. Caballero at his home and attended church with him at least once. *See id.* at A440–42. These interactions took place while Mr. Balarezo had a wife and children, and Mr. Balarezo acknowledged that took his daughter to the park with Mr. Caballero. *Id.* at A432, A439.

Turning to the night of Mr. Kollman's death, Mr. Caballero's trial counsel opened by asking Mr. Balarezo, "It's your testimony that you saw my client stab somebody or what you believe was a stabbing?" App'x A435. Mr. Balarezo answered that he "didn't see [Mr. Caballero] stabbing [Mr. Kollman]." *Id.* Probing

17

the reasons for Mr. Balarezo's delay in telling police, Mr. Caballero's trial counsel

initiated this exchange:

> [DEFENSE]:  It's your testimony that you were scared to come forward, correct?
> [MR. BALAREZO]:  I was scared to come forward.
> [DEFENSE]:  And part of being scared was that you were afraid of retaliation from my client, correct, if you came forward?
> [MR. BALAREZO]:  I was scared period.
> [DEFENSE]:  Were you scared for retaliation from my client?
> [MR. BALAREZO]:  I was scared of retaliation from your client towards me.
> [DEFENSE]:  Or your family.
> [MR. BALAREZO]:  I'm scared right now for retaliation.
> [DEFENSE]:  But I'm asking —
> [MR. BALAREZO]:  I'm still scared.
> [DEFENSE]:  Prior to you coming forward and telling the detectives what you told them, were you scared for your safety and your family's safety in fear of retaliation?
> [MR. BALAREZO]:  Yes.
> [DEFENSE]:  Yes?
> [MR. BALAREZO]:  Yes.
> [DEFENSE]:  Okay.

*Id.* at A436–37.

Mr. Caballero's trial counsel attempted to undermine Mr. Balarezo's

explanations for his delay by eliciting testimony that he had continued to interact

with Mr. Caballero—including bringing his daughter to the park with Mr.

Caballero—long after he allegedly learned that Mr. Caballero had stabbed Mr.

Kollman and left him to die.  *See* App'x A437–43.  Trial counsel also inquired about

the circumstances surrounding Mr. Balarezo's interview with officers, including

18

whether he had felt "pressure" because of the open warrant or received any favorable treatment in that regard because of the information he disclosed. *See id.* at A445–46. Trial counsel probed the conduct underlying that warrant and Mr. Balarezo's guilty plea at length. *See id.* at A447–53.

Mr. Caballero's trial counsel then began an extended line of questioning about the layout of 43-43 Kissena. *See* App'x A466–72. There appeared to be some confusion about the questions, and at one point the court admonished trial counsel, "Take a breath. Let [Mr. Balarezo] answer. Then ask another question. Okay?" *Id.* at A469. He began asking about a second stairwell, and the prosecutor objected to the characterization of the "other stairwell." *See id.* at A470. Mr. Caballero's trial counsel insisted that there was a second stairwell, telling the court in the presence of the witness and jury, "I've been there." *Id.* The court admonished trial counsel again, asking him, "You want to testify now . . . ? That is improper. You know it. Don't do that." *Id.* Trial counsel responded, "The prosecutor is misleading the jury. She has been there." *Id.* The court again directed trial counsel to "[s]top it." *Id.* at A471.

In his habeas petition, Mr. Caballero claimed that at this point, his trial counsel threw a pen at the prosecutor. The court admonished, "Don't be throwing pens. Act

like adults, both of you.  Ask questions.  Let him answer.  Then ask another question.

Don't testify.  Everybody clear?"  App'x A471.

After taking the witness through his testimony about the altercation on the

rooftop, *see* App'x A472–82, Mr. Caballero's trial counsel returned to an extended

examination of the stairwell issue, *see id.* at A482–87.  He concluded his cross-

examination by reviewing Mr. Balarezo's account of what happened after he left the

roof.  *See id.* at A487–516.

The court later addressed the stairwell issue outside the presence of the jury.

The prosecutor claimed that she did not "know where he was going with those

questions" because there was only one stairwell on each side of the building, not

two, as Mr. Caballero's trial counsel had insinuated.  App'x A521.  Addressing Mr.

Caballero's trial counsel, the court said, "You fooled me . . . .  I am sitting here

thinking there are two staircases.  That's not true?"  *Id.* at A522.  He responded, "I

was there, Judge, and my recollection is pretty clear that it is two separate stairwells

and I am clear on that."  *Id.*  The court noted that the "jury has heard [nine] million

questions on this subject, [and] they are entitled to know whether there is one

staircase or two."  *Id.*

The court instructed the prosecutor to send a detective to verify the number of

staircases, which turned out to be one, not two.  App'x A526.  The detective testified

20

to that fact, and Mr. Caballero's trial counsel stipulated that "there is one staircase from the lobby all the way up onto the roof," contradicting his earlier insinuations before the jury.  *Id.* at A538.

### C.   Nadia Sierra

Ms. Sierra was Mr. Caballero's girlfriend on February 1, 1995, and she testified to her knowledge of events that took place that night.  Ms. Sierra claimed that she and Mr. Kollman "grew up together for many, many years" and that she called him "[m]y little Jason."  App'x A601.  She babysat Mr. Kollman when he was younger and the two became "good friends" when he got older.  *Id.* at A602.  Ms. Sierra dated Mr. Caballero from September 1994 to February 1995, with the relationship ending shortly after Mr. Kollman was killed.  *Id.*  In February 1995, Mr. Caballero had been living at her apartment on the first floor of 43-43 Kissena.  *Id.* at A603.  She said that she "begged [Mr. Caballero] to leave" after the incident and met her now-husband soon after, which led her to move out of the apartment.  *Id.* at A604.

Ms. Sierra testified that on the night of Mr. Kollman's death she attended a birthday party for her friend Junie.  *See* App'x A604.  She said that Mr. Caballero, Mr. Lugo, and Mr. Balarezo were all at the party and Mr. Kollman "came a little late."  *Id.* at A646.  At trial, Ms. Sierra could not recall who had been drinking, but

21

she guessed that "Mike Lugo maybe had [a] few because I do know he drinks occasionally, not all of the time, occasionally." *Id.* at A648. Everyone left the party when it broke up "[a]round 5:00 [PM]." *Id.* at A646.

After leaving the party, Ms. Sierra witnessed Mr. Lugo and Mr. Kollman get into a fight outside a nearby deli. App'x A605. She said she "saw fists flying around" before the two were separated and "some words were exchanged" before Mr. Lugo "just really got upset and he left." *Id.* She saw Mr. Caballero leave the deli with Mr. Kollman in the direction of 43-43 Kissena, with Mr. Balarezo "a few steps after them." *Id.* at A606–07.

Ms. Sierra then went home, changed, and went to pick up her son from her mother, who lived on the fourth floor of the same building. App'x A604, A608. While Ms. Sierra was waiting for the elevator on the first floor, Mr. Balarezo "came down the stairs . . . white as a ghost." *Id.* at A609. According to Ms. Sierra, "[Mr. Balarezo] was nervous. He looked like he was about to cry. He was in shock." *Id.* at A610. Ms. Sierra heard Mr. Balarezo say, "I can't believe he killed him. I can't believe this. This is crazy." *Id.* at A614. She said, "He kept repeating that, [']I can't believe he did it. I can't believe he killed him.['] He just kept repeating it, the same thing in different ways." *Id.* at A615.

Mr. Caballero's trial counsel had attempted to keep this portion of Ms. Sierra's testimony out as inadmissible hearsay.  Mr. Balarezo did not remember saying the words and claimed that no one was in the hallway with him when the elevator doors opened.  App'x A611.  The court overruled the objection, explaining:

> I find that this was the product of a startling event.  It was uttered close in time to the event about which he was speaking . . . .  You know, the very tenor of the statement, I think, speaks to its being made under stress, and of course the emotional state of the defendant [sic] as has just been testified to by this witness all draw me to the conclusion that this statement was not made under the impetus of studied reflection, and accordingly I'm going to allow it in.

*Id.* at A613.

Ms. Sierra also testified about the events following Mr. Balarezo's excited utterance.  She said, "Two minutes later the elevator opens up, and I saw Andrew Caballero come out of the elevator. . . .  He was covered with blood, and he just said [we] all got to go into the apartment."  App'x A615.  Ms. Sierra stated that the blood was "[e]verywhere."  *Id.*  She clarified, "His face, his arms, his clothes. . . .  It was all over the place."  *Id.*  The three returned to Ms. Sierra's apartment, where Mr. Balarezo was "[p]acing around, saying the same thing."  *Id.*  Ms. Sierra "freaked out" because the blood on Mr. Caballero's and Mr. Balarezo's clothes was "making [her] nervous."  *Id.* at A615–16.

23

Ms. Sierra heard Mr. Caballero tell them to "[c]alm down," adding, "we have got to get out of here." App'x A616. Mr. Balarezo then said, "I have a perfect place. We are going to go to the pool hall as we always go." *Id.* Mr. Caballero changed his clothes and all three of them left the apartment "around 6:00, 6:30 [PM]." *Id.* at A617. Only about "[f]ive, ten minutes . . . [n]o more than that" had passed between when Ms. Sierra saw Mr. Caballero appear in the elevator covered in blood and when Ms. Sierra, Mr. Caballero, and Mr. Balarezo all left her apartment. *Id.*

Ms. Sierra then went to her mother's house to pick up her son. App'x A619. She spent "[a]bout five minutes" at her mother's apartment before going to her "best friend" Monique Moses's house. *Id.* Ms. Sierra did not tell Ms. Moses about what had happened in her apartment. *See id.* at A618–19. Ms. Sierra spent several hours at Ms. Moses's apartment and left for home at around 4:00 AM. *Id.* at A619.

When Ms. Sierra arrived home, Mr. Caballero was already in the apartment watching television. App'x A620. Ms. Sierra said he seemed "[c]alm . . . [n]onchalant . . . [l]ike nothing ever happened." *Id.* Mr. Caballero instructed Ms. Sierra that if the police came she should not "say anything" and "try not to open the door." *Id.* at A621. Mr. Caballero told her that she knew "what [he was] capable of" and threatened Ms. Sierra's son and mother. *Id.* An hour later, police officers knocked on the door. *Id.* at A620. When Ms. Sierra answered, Mr. Caballero stayed

24

"behind the door like a few steps back," where "[t]he police could not have seen him." *Id.* at A620–21. Ms. Sierra did not tell the police anything that night. *Id.* at A621.

Ms. Sierra testified that she had another conversation with Mr. Caballero about Mr. Kollman the next day. In that conversation, Mr. Caballero said that the killing was "about jealousy" because Ms. Sierra and Mr. Kollman "might have seemed flirty," which Ms. Sierra said "was ridiculous." App'x A622–23. Then, Mr. Caballero said, "I just wanted to feel how it is—how it feels to kill a man . . . just to know that feeling of taking a life away." *Id*. Mr. Caballero told Ms. Sierra that he had stabbed Mr. Kollman and that he had "cried like a little girl" while "begging for his life." *Id.* at A624. After that conversation, Ms. Sierra "begged [Mr. Caballero] to leave," and he said, "don't worry about it, I already have another girlfriend." *Id.* at A625. Eventually, Mr. Caballero had someone come with a van and move his things out of the apartment. *Id.*

Ms. Sierra claimed that police came to talk to her again in 1995 and that she told them what she knew but "skipped a couple of things because I was still nervous." App'x A627. She claimed that she also spoke to police in 2003 and again told them what happened and that they took her to the precinct to give a statement. *Id.* at A628. The prosecutor acknowledged that none of the DD5s or other

25

documents from 1995 memorialized an interview where Ms. Sierra reported seeing Mr. Caballero covered in blood and heard an excited utterance by Mr. Balarezo, and the court declined to hold an evidentiary hearing on the issue. *See id.* at A629–34. The DD5 for the 2003 statement included information about Mr. Caballero's confession, but it omitted details related to the blood and the excited utterance. *See id.* at A703–04.

On cross-examination, Ms. Sierra clarified that she had not told detectives about Mr. Caballero appearing in the elevator covered in blood or Mr. Balarezo's comments about a killing when they first came to see her in the fall of 1995, before she moved out of 43-43 Kissena. *See* App'x A640–41. In 2003, the detectives visited her at her new home and "finally convinced [her] to testify." *Id.* at A642. However, Ms. Sierra later contradicted herself by saying that when detectives came to see her in the fall of 1995, she told them about hearing Mr. Balarezo's excited utterance and seeing Mr. Caballero appear covered in blood in the elevator. *See id.* at A686. When pressed, she doubled back and claimed that she actually meant that she had told the police everything in 2003, when she went down to the 109th Precinct and "it all came together." *Id.* at A687. Finally, Ms. Sierra again claimed that she had told detectives "about the blood and the statement and the fight" when she spoke to them in the fall of 1995. *See id.* at A688.

Ms. Sierra also clarified the nature of her relationship with Mr. Caballero.  She said that she knew their relationship was not "exclusive" because "he was cheating on me."  App'x A645.  In fact, just before he moved out, Mr. Caballero said he had "already found somebody" and was on his phone "talking to this girl in front of me the whole night."  *Id.*

On cross-examination, Mr. Caballero's trial counsel pointed out several inconsistencies in Ms. Sierra's testimony.  First, he noted that Ms. Sierra had testified under oath to the grand jury that "everybody was drinking" at Junie's party. App'x A651.  Ms. Sierra also did not recall that she had told investigators in 2011 that "everyone was drunk" at the party.  *See id.* at A652–53.  She did recall that Mr. Balarezo was drinking "a little bit" at the party.  *Id.* at A653.  She also stated that she saw Mr. Caballero "breaking up the fight" between Mr. Lugo and Mr. Kollman and "trying to calm down" Mr. Kollman.  *Id.* at A655.  Ms. Sierra now said that Mr. Caballero, Mr. Kollman, and Mr. Balarezo left the deli toward 43-43 Kissena at around 6:30 PM, and she stayed outside the deli trading "gossip and speculations" for another 10 to 15 minutes after they departed.  *Id.* at A656–57.  This contradicted her earlier testimony that she had returned to the building, headed to pick up her son from her mother's apartment, seen Mr. Caballero emerge from the elevator covered in blood, gone back to her apartment with him, and then departed along with Mr.

Caballero and Mr. Balarezo by "around 6:00, 6:30 [PM]." *See id.* at A617.  She later

testified that she was not sure of the timing but believed that she went to take the

elevator to pick up her son "around six o' clock."  *Id.* at A754.  She apologized for

any discrepancy, explaining that "sometimes . . . I get my answers a little bit off."

*Id.*

Mr. Caballero's trial counsel also attempted to get Ms. Sierra to admit that she

had not actually seen Mr. Caballero exit the elevator covered in blood.  *See* App'x

A791.  Trial counsel pointed out that Ms. Sierra never called police to help Mr.

Kollman after she allegedly witnessed Mr. Caballero covered in blood and Mr.

Balarezo exclaiming that he had killed Mr. Kollman, even though she claimed Mr.

Kollman was her long-time friend.  *Id.* at A790–91.  This line of questioning led to

a tense exchange between Mr. Caballero's trial counsel and Ms. Sierra:

> [DEFENSE]:  Isn't it a fact you never saw [Mr. Caballero] get out of
> that elevator?  Isn't that a fact?  And isn't it a fact had you seen—
> [MS. SIERRA]:  I swear to God.
> [DEFENSE]:  —seen [Mr. Caballero] get out of the elevator and you
> knew [Mr. Kollman] was injured you would have made a phone call?
> [MS. SIERRA]:  Please, don't scream at me.
> THE COURT:  Sustained.

*Id.*

Mr. Caballero's trial counsel also sought to undermine Ms. Sierra's testimony

about her relationship with Mr. Kollman.  He confronted her with grand jury

28

testimony where she stated that she had only known Mr. Kollman since she had met

Mr. Caballero and where she had failed to recall his last name when asked. *See*

App'x A749. She again failed to remember his last name when Mr. Caballero's trial

counsel asked her on the stand at trial, and she appeared to confuse Mr. Kollman's

last name with that of the detective who interviewed her in 2003. *See id.* at A750.

Later, she claimed to have "remembered his name while I was in [sic] the break,"

during an answer to an unrelated question. *Id.* at A791.

Mr. Caballero's trial counsel also confronted Ms. Sierra with a statement she

had made to detectives in 2003, where she claimed that Mr. Balarezo had approached

her at the Fashion Institute of Technology (FIT) and asked whether anyone had

questioned her about what happened in 1995. *See* App'x A787, A789. Ms. Sierra

initially said that she "totally forgot about" running into Mr. Balarezo at FIT. *See*

*id.* at A787. As the line of questioning continued, she claimed to remember the

meeting, insisted that no conversation about the events in 1995 took place, and

denied ever telling detectives otherwise. *See id.* at A788–89. Meanwhile, Mr.

Balarezo denied that he ever ran into Ms. Sierra at FIT or anywhere else, and he

testified that he "[n]ever went to FIT in [his] life." *Id.* at A515.

Mr. Caballero's trial counsel highlighted collateral inconsistencies in Ms.

Sierra's account. He confronted her with inconsistent statements about whether she

29

merely napped at Ms. Moses's apartment or "got drunk and passed out," the length of time after the murder that Mr. Caballero moved out, whether she saw Mr. Caballero again after he moved out, and other matters. *See* App'x A766–67, A785–86.

Mr. Caballero's trial counsel ultimately moved for a mistrial on basis that Ms. Sierra's shifting and "potentially inaccurate" statements about what she had reported to police, and when she made particular statements to them, had prejudiced the jury. *See* App'x A690–91. The prosecutor responded that trial counsel had cross-examined Ms. Sierra on the inconsistencies, and the court denied the motion. *See id.* at A691–92.

Discussing the DD5s from 1995 that had been located, the prosecutor noted that there was a record of Ms. Sierra's initial interview after Mr. Kollman's death. *See* App'x A693. On that DD5, officers recorded that Ms. Sierra had witnessed arguments between Mr. Caballero and Mr. Lugo during which each accused the other of killing Mr. Kollman. *Id.* at A694. When the prosecutor later spoke to the three detectives who worked the case in 1995 at the court's direction, none of them recalled speaking to Ms. Sierra about seeing Mr. Caballero covered in blood or hearing Mr. Balarezo say anything about Mr. Kollman's death. *Id.* at A699–700. Mr. Caballero's trial counsel and the prosecutor discussed how best to clear up the

record before the jury, and the court floated the possibility of a stipulation about what Ms. Sierra had actually reported in 1995 and 2003. *See id.* at A699–706. No stipulation was entered.

### D.    Detective Casaza

Detective David Casaza testified to his reinvestigation of the case in 2003. At the time, Detective Casaza was a homicide/major case detective assigned to the 109th Precinct. App'x A820. Detective Casaza began investigating Mr. Kollman's death around September 2003, when he interviewed Mr. Kollman's mother and Ms. Sierra. *Id.* at A821. Detective Casaza testified that he spoke to Ms. Sierra "[a] couple of times . . . [t]hree, four times," but he only prepared a DD5 for the interview that took place on September 17, 2003. *Id.* at A821–24. Ms. Sierra did not report the blood or excited utterance in that interview. *Id.* at A826–27.

On redirect examination, Detective Casaza clarified, "[A]t some point in time [Ms. Sierra] did indicate to me that she saw [Mr. Caballero] coming off an elevator, had blood on him. [Mr. Balarezo] had come out of the staircase and indicated I can't believe [Mr. Caballero] did it. But I was in the middle of other cases and unfortunately I never memorialized it." App'x A828–29.

Pressed on re-cross on his reasons for failing to memorialize the information, Detective Casaza explained that "around the time that I spoke to [Ms. Sierra], that I

31

received that information, I was in the middle of an investigation that involved myself, that I had a hit put out on me and my family." App'x A830. Detective Casaza said that it was possible he had written something down and "[g]enerally [he] would have" created a record of that type of information, but he did "not have any paperwork indicating that [he] did" on this occasion. *Id.* at A832. During a sidebar, Mr. Caballero's trial counsel unsuccessfully pressed the court to allow him to conduct further cross-examination about Detective Casaza's ability to memorialize other, seemingly more trivial matters related to the case in the same timeframe. *See id.* at A835–37.

### E.   Detective Dewhurst

Detective Robert Dewhurst was a member of the Cold Case Squad and testified to his reinvestigation of the case in 2011. *See* App'x A535. He testified that he interviewed Ms. Sierra, Mr. Balarezo, and Mr. Lugo before arresting Mr. Caballero for Mr. Kollman's murder. *See id.* at A553–57. Detective Dewhurst also retrieved bottles that Mr. Caballero had used for the purpose of testing them against DNA evidence in the case. *Id.* at A558–59. As with the other witnesses, Mr. Caballero's trial counsel used part of his cross-examination to engage Detective Dewhurst in an extended exchange about the layout of 43-43 Kissena and the location of its staircases. *See id.* at A562–68, A572–74.

Detective Dewhurst was also the only witness called on behalf of the defense. Mr. Caballero's trial counsel asked whether he recalled that Ms. Sierra indicated she searched for the clothes Mr. Caballero had been wearing after he returned from the roof. *See* App'x A841–42.  He answered in the affirmative.  *See id.*

### F.   Forensic Witnesses

The state presented testimony from three forensic witnesses.  Mr. Caballero's trial counsel did not cross-examine any of the forensic witnesses, and none of the testimony they gave implicated Mr. Caballero in Mr. Kollman's death.

Dr. Sean Kelly, a forensic pathologist from the Office of the Chief Medical Examiner (OCME), testified about Mr. Kollman's autopsy and walked the jury through photos of his injuries.  *See* App'x A712–44.

Detective Cynthia Ramirez of the NYPD latent print section testified that a "print of value" had been recovered from the roof door at 43-43 Kissena.  *Id.* at A792, A798.  Detective Ramirez explained that examiners deem a latent print "of value" where "there is enough quality and/or quantity of information to . . . do a comparison" with other prints.  *Id.* at 798–99.  Mr. Caballero, Mr. Kollman, Mr. Balarezo, and Mr. Lugo were all excluded as possible donors for the print lifted from the roof door.  *Id.* at A799–800.

Craig O'Connor of the OCME testified as an expert on DNA analysis.  *See* App'x A801–04.  Mr. O'Connor testified that his lab had tested blood and skin cells recovered from a black jacket, brown shoe, and white visor found at the crime scene and matched the blood to Mr. Kollman's DNA profile.  *See id.* at A807–09.  The brown shoe was stained with a mixture of blood from two donors, one of whom was determined to be Mr. Kollman.  *Id.* at A810.  The OCME also matched Mr. Kollman's DNA to samples recovered from "two pieces of gauze like material," recovered from the sixth-floor fire escape and the interior of the roof door; blood from "small pieces of wood like material" recovered from the handrail of the stairwell between the fifth and sixth floors; and fingernail clippings from Mr. Kollman's autopsy.  *See id.* at A541–42, A810–11.  The OCME also obtained Mr. Caballero's DNA profile from the bottles recovered by Detective Dewhurst.  *Id.* at A813.  Using that information, the OCME tested the mixture on the brown shoe and ruled out Mr. Caballero as a contributor.  *Id.*

### iii.   Motion to Dismiss

After the prosecution rested its case, Mr. Caballero's trial counsel moved for an order of dismissal in Mr. Caballero's favor.  He argued that the state could not meet its burden because its case rested on the testimony of witnesses whose "reliability and credibility . . . [had] really been impacted significantly."  App'x

A839.  The prosecutor responded that the state felt it had carried its burden and "[c]redibility is an issue of fact for the jury."  *Id.* at A840.  The court denied the motion.  *See id.*

### iv.   Summations

#### A.   Defense

In closing, Mr. Caballero's trial counsel focused on casting doubt on the reliability of Mr. Balarezo and Ms. Sierra.  He told the jury that "there is no factual dispute in terms of what actually happened to Jason Kollman up on that roof that night," but that the government had failed to prove beyond a reasonable doubt that Mr. Caballero was the person responsible.  App'x A849.  Trial counsel pointed out all the inconsistencies between the accounts of the two witnesses and suggested that Mr. Balarezo's "ability to perceive and recall the events" might have been "impaired" by alcohol or marijuana use.  *Id.* at A852.  He also insinuated that Mr. Balarezo might have moved out of the state because he had "something to hide," and that he decided to "[lay] this in [Mr. Caballero's] lap because he was afraid of going to jail" when police contacted him and put "pressure" on him to talk.  *Id.* at A854, A858, A867.  Trial counsel also asked the jury to consider why Mr. Balarezo would have continued to socialize with Mr. Caballero and even bring his children to the park with Mr. Caballero if he was afraid of him.  *See id.* at A855.  Finally, trial

counsel suggested that Mr. Balarezo may have cast blame on Mr. Caballero in exchange for benefits from the state, including lenient treatment on his open warrant. *See id.* at A857, A868.

Turning to Ms. Sierra's testimony, trial counsel again focused on the inconsistencies in her various accounts of the night of Mr. Kollman's death, as well as how her account conflicted with that given by Mr. Balarezo. Trial counsel argued, "[T]he question is, is she lying? Is she mistaken? Has she completely forgotten the events? . . . [It]'s up to you to evaluate her testimony." App'x A860. Trial counsel also sought to anticipate the prosecution's argument that Mr. Balarezo did not remember Ms. Sierra being at the elevator with him because he was in shock at the events that had just unfolded, arguing that Mr. Balarezo's own testimony indicated that he "ha[d] his feet on the ground" by the time in question. *Id.* at A863.

Trial counsel highlighted that there was no documentary record of Ms. Sierra mentioning blood or an excited utterance in 1995 or 2003. App'x A864. He walked the jury through Detective Casaza's testimony and argued that the explanations offered for his failure to record such incriminating information in 2003 were "a poor attempt by the prosecution to try to support [Ms. Sierra's testimony] . . . [and] it just doesn't meet the test of common sense." *Id.* at A866.

36

Trial counsel argued that Ms. Sierra was lying in her testimony and that she "started crying" on the stand "[t]o deflect attention, to garner sympathy for herself." App'x A869. Offering possible motives for Ms. Sierra, the trial counsel encouraged the jury to ask themselves: "Was she angry at [Mr. Caballero] for cheating on her . . . . ? Was she scared?" *Id.* at A870. Ultimately, trial counsel argued that the jury should "disregard [Ms. Sierra's] testimony because she was not forthright with you." *Id.* He added, "She did not tell you the truth. She did not come forward and answer questions in a forthright way. She was evasive. She hedged, and she did everything she could to try to garner sympathy for herself." *Id.* He concluded that Ms. Sierra's testimony was "incredible, unreliable, should not be credited by you under any circumstances." *Id.* at A877.

Trial counsel argued that the layout of the building made the prosecution's version of events "physically impossible." App'x A883. His argument was at times hard to follow from the transcript, and it elicited an objection from the prosecutor. *See id.* at A883. The crux of it seems to be that it would be "illogical [and] improbable" that someone would go down two flights of stairs from the roof, deposit blood on the fifth-floor handrail, and then re-enter the fifth floor and continue down in the elevator, rather than getting on the elevator directly from the sixth floor. *See id.* at A883–86.

37

Trial counsel highlighted that Ms. Sierra had said that Mr. Lugo "exploded and was upset and was angry" that night, while Mr. Caballero had protected Mr. Kollman from Mr. Lugo.  *See* App'x A889.  Trial counsel suggested the fact that Mr. Lugo had "friction" with Mr. Kollman shortly before he was killed "is something for [the jury] to consider." *Id.* at A889–90.

### B.   Prosecution

In her closing, the prosecutor focused on bolstering the jury's confidence in Mr. Balarezo's and Ms. Sierra's testimonies.  The prosecutor claimed that Mr. Caballero's trial counsel had failed to show that either witness had "any reason whatsoever to lie."  App'x A910.  She attempted to undermine the possible motivations to lie floated by Mr. Caballero's trial counsel.  The prosecutor argued that it was not reasonable to believe that Ms. Sierra was motivated by anger at Mr. Caballero over cheating on her because "a woman [who is] married [and] who has children of her own now" would not "come to court and answer questions by an experienced defense attorney who yelled at her, who accused her of doing nothing to help her friend, who screamed at her and made her break down because she didn't call 911" out of hard feelings stemming from a relationship that ended two decades earlier. *Id.* at A911.

38

As to Mr. Balarezo, the prosecutor argued that it was not reasonable to believe that he would pin a murder on someone over favorable treatment on a misdemeanor warrant. The prosecutor pointed out that Mr. Balarezo "pled guilty to the misdemeanor." She stated, "He paid a $300 fine," and asked, "Is that a reason he is going to frame his friend of 20 years for a crime he didn't commit? . . . That makes no sense, ladies and gentlemen." App'x A912. She pointed out that Mr. Caballero's trial counsel had insinuated Mr. Balarezo might "have something to hide" with respect to Mr. Kollman's death, but she argued that trial counsel could not come out and accuse Mr. Balarezo of the stabbing "because there is not one shred of credible evidence before you to suggest" that conclusion. *Id.* at A909.

The prosecutor also responded to trial counsel's argument about the staircases. She pointed out that, contrary to the thrust of trial counsel's argument, no witness had ever claimed that Mr. Caballero re-entered the building on the sixth floor rather than on the fifth floor or lower down. App'x A924. She argued that "nobody knows at what point [Mr. Caballero] got from the stairwell into the elevator" but that "we know he went down to at least the fifth floor" because Mr. Kollman's blood was found there and Mr. Caballero was the only one who had that blood on him. *Id.* Responding to trial counsel's assertion that a killer would not have gone to the fifth floor if he intended to take the elevator, the prosecutor told the jury, "[I]t's not your

job to decide why a murderer does what they do.  It is your job to determine whether or not it was this defendant [who committed the murder]." *Id.* at A928.

### v.   Jury Deliberations

Jury deliberations took place over three days.  During deliberations, the jury sent the court a note asking to be read back the "[e]levator statements of both [Ms. Sierra] and [Mr. Balarezo] when asked both witnesses 'When was the first time you saw [Mr. Caballero] in the elevator' and then how did [Ms. Sierra] and [Mr. Balarezo] meet."  App'x A951.  The jury also requested that the court re-read its charge in full.  *See id.* at A952–53.  On the third day, the jury returned a guilty verdict.  *See id.* at 967–69.

### vi.   Sentencing

At sentencing, the prosecution requested the statutory maximum of 25 years to life in prison.  *See* App'x A978.  The prosecution highlighted Mr. Caballero's "evil and wicked mindset" and presented witness impact testimony from Mr. Kollman's mother.  *Id.* at A974–75, A977–78.  Mr. Caballero's trial counsel asked for the court to consider 15 years to life, highlighting that Mr. Caballero was a "productive individual" and that he had "been nothing but professional with me and fair and helpful in his own defense." *Id.* at A979.  Mr. Caballero gave a statement in which he implicitly maintained his own innocence but told Mr. Kollman's mother

that he was sorry for her loss.  *See id.* at A980.  The court emphasized that "this [was] a particularly vicious and senseless killing" and imposed an indeterminate sentence of 25 years to life.  *Id*. at A980–81.

### c.  Direct Appeal

Mr. Caballero appealed his conviction to the Second Department.  He was represented on appeal by Danielle Muscatello, an attorney from the same firm who handled his trial and, indeed, had served as second chair in that proceeding.  Mr. Caballero's appellate counsel raised several grounds for error, including that: (1) the evidence was legally insufficient and the verdict was against the weight of evidence; (2) the trial court improperly curtailed his trial counsel's cross-examination of Detective Casaza on his failure to memorialize Ms. Sierra's statements in 2003; (3) the trial court declined to resolve the *Rosario* issue related to Ms. Sierra's statements to police, instead forcing trial counsel to cross-examine her about it with insufficient information; (4) the trial court erred by admitting Ms. Sierra's testimony about an alleged excited utterance; and (5) the trial court erred by shielding information about Mr. Balarezo and Ms. Sierra until immediately before trial.  *See* App'x A982–1052. Appellate counsel did not raise any challenges related to trial counsel's performance.

The Second Department affirmed Mr. Caballero's conviction in a brief decision.  On the sufficiency of the evidence, the court found the claim "largely

unpreserved for appellate review." *Caballero*, 137 A.D.3d at 929 (citing *People v. Gray*, 86 N.Y.2d 10, 19 (1995)).  The court further found that, even if the issue had been preserved, the evidence was sufficient to support the verdict, which it also found was not against the weight of the evidence.  *Id.* (citing *People v. Romero*, 7 N.Y.3d 633 (2006)).

The court rejected Mr. Caballero's claims related to Detective Casaza.  It found that this issue was also unpreserved for appellate review, but in any event the limitations on cross-examination were within the discretion of the trial court.  *Id.* at 929–30 (first citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); then citing *People v. Legere*, 81 A.D.3d 746, 750 (2d Dep't 2011); then citing *People v. Gaviria*, 67 A.D.3d 701 (2d Dep't 2009); and then citing *People v. Francisco*, 44 A.D.3d 870 (2d Dep't 2007)).

Turning next to the *Rosario* issue, the court held that the prosecutor had satisfied her burden by stating that she had searched for, but could not locate, any recorded prior statements other than those that had been turned over.  *Id.* at 930.  Accordingly, Mr. Caballero's challenge failed because he could not articulate a factual basis for claiming that the prosecutor improperly denied the existence of such statements, as necessary to warrant a hearing.  *Id.* (first citing *People v. Poole*, 48

N.Y.2d 144, 149 (1979); then citing *People v. Rodriguez*, 270 A.D.2d 505 (2d Dep't 2000); and then citing *People v. Perez*, 209 A.D.2d 643, 644 (2d Dep't 1994)).

The court rejected Mr. Caballero's challenge to the admission of hearsay statements as excited utterances.  It found that "[t]he circumstances surrounding the statement warrant the conclusion that the statement was not made 'under the impetus of studied reflection' and permit a reasonable inference that the declarant had an opportunity to observe the altercation that led to the victim's death." *Id.* at 930 (first quoting *People v. Edwards*, 47 N.Y.2d 493, 497 (1979); then citing *People v. Fratello*, 92 N.Y.2d 565, 571 (1998); and then citing *People v. Young*, 308 A.D.2d 555, 556 (2d Dep't 2003)).

The court rejected the rest of Mr. Caballero's claims as meritless. *See id.*  The Court of Appeals denied leave to appeal the decision. *Caballero*, 28 N.Y.3d at 927. It also denied a motion to reconsider its ruling denying leave to appeal. *People v. Caballero*, 28 N.Y.3d 1071, 1071 (2016).

### d. Coram Nobis Application

In 2017, Mr. Caballero filed a pro se application for a writ of error coram nobis in the Second Department. *See* App'x A1197.  The application charged that Mr. Caballero was denied his Sixth Amendment right to effective assistance of appellate counsel.  Mr. Caballero argued that the fact that his appellate counsel was

a member of the same firm as his trial counsel and had participated in his defense was a conflict of interest that prevented her from raising meritorious claims of ineffective assistance of trial counsel in his direct appeal. *See id.* at A1239–41.

Mr. Caballero listed 11 different claims related to his trial counsel's performance that he believed his appellate counsel was ineffective for failing to raise. *See* App'x A1241–80. Among these was the claim that "[e]vidence shows Mike Lugo is a documented violent man who had the means, motive and opportunity to kill Mr. Kollman, and, as the evidence establishes, is the likely perpetrator." *Id.* at A1244.

The state opposed Mr. Caballero's application. The state's affirmation in opposition averred that counsel for the state had spoken with Mr. Caballero's appellate counsel, who

> stated that she specifically recalls having a conversation with [Mr. Caballero's] mother and wife, both of whom were involved throughout [Mr. Caballero's] case, regarding the potential conflict arising as a result of representing [Mr. Caballero] at trial and on appeal, as they could not argue that they had been ineffective as trial counsel. Although [appellate counsel] did not specifically recall having this conversation with [Mr. Caballero] himself, it is her normal practice to do so in such circumstances, and she does so as a matter of course.

App'x A1291.

44

The state did not submit an affidavit from Mr. Caballero's appellate counsel, who "preferred not to submit an affirmation, [but] reviewed the memorialization of [the] conversation" before the state submitted its filings.  App'x A1291 n.2.

The state also talked up the effectiveness of Mr. Caballero's trial counsel. Addressing trial counsel's failure to highlight Mr. Lugo as an alternative suspect, the state claimed that "[t]he crux of the defense was to attack the People's case and argue that the evidence did not establish [Mr. Caballero's] guilt beyond a reasonable doubt,"[5] which it argued he did effectively.  App'x A1299.  The state also suggested that Mr. Caballero's trial counsel *had* "intimated that [Mr.] Lugo was a stronger suspect than [Mr. Caballero]" by pointing the jury to the "friction" they had before the killing.  *Id.* at A1300.

The Second Department denied Mr. Caballero's application.  In a one-page decision and order, the court held that Mr. Caballero "failed to establish that he was denied the effective assistance of appellate counsel."  *People v. Caballero*, 157 A.D.3d 812, 812 (2d Dep't 2018) (first citing *Jones v. Barnes*, 463 U.S. 745 (1983); and then citing *People v. Stultz*, 2 N.Y.3d 277 (2004)).  The Court of Appeals denied leave to appeal.  *People v. Caballero*, 31 N.Y.3d 1146, 1146 (2018).

---

[5] One wonders what other strategy a criminal defense attorney might pursue.

e.  **440.10 Motion**

In 2018, Mr. Caballero filed the instant petition for habeas corpus relief pursuant to 28 U.S.C. § 2254.  In 2021, while proceedings in this Court were still ongoing, Mr. Caballero pursued a motion to vacate his criminal conviction pursuant to New York Criminal Procedure Law § 440.10, on the basis of ineffective assistance of trial counsel.  *See* App'x B1.  I stayed the instant petition and held it in abeyance pending the resolution of the 440.10 motion.

The 440.10 motion was filed before the Queens County Supreme Court on February 15, 2022, and it was assigned to the Honorable Gia L. Morris because the judge who had presided over Mr. Caballero's trial had retired.  *See* App'x B681–82, B682 n.2.  Mr. Caballero's motion argued that he had received ineffective assistance of trial counsel, in violation of both the New York State and Federal Constitutions. He argued that his trial counsel had been ineffective because he failed to investigate the case by neglecting to interview key witnesses or examine the crime scene; failed to seek a curative instruction about missing *Rosario* material; and failed to seek a limiting instruction regarding Detective Casaza's hearsay testimony.  *See id.* at B255–82.  The state opposed the motion and argued that Mr. Caballero's trial counsel had provided him with competent representation.  *See id.* at B319–65.

The 440.10 court held a hearing on the motion over the course of two days in August 2023.  *Id.* at B683; *see also* B410–504, B505–31.  At the hearing, the court heard testimony from four witnesses: Danielle Muscatello, Edward Dowd, Nelson LaSalle, and Irwin Blye.  It also reviewed the notes of lead trial counsel, Robert DiDio.

### i.   Hearing Testimony

#### A.   Danielle Muscatello

Danielle Muscatello served as the second seat at Mr. Caballero's trial and as his counsel on direct appeal.  App'x B415, B524.  She began working on Mr. Caballero's case around the time that his trial began, in July 2014.  *Id.* at B415.  Her responsibilities included reviewing the *Rosario* material, including the DD5s, and aiding at trial by preparing points for cross-examinations and summation, taking notes, and conducting legal research.  *Id.* at B455–56, B517–21.

Regarding the investigation undertaken by Mr. Caballero's trial counsel, Ms. Muscatello testified that she reached out to an investigator, Edward Dowd, for assistance.  *See* App'x B417–19.  On July 23, 2014, the day that jury selection in Mr. Caballero's trial began and only five days before the opening statements, she emailed Mr. Dowd, asking him to interview Michael Lugo, Monique Moses, and Javier Peralta, the latter being "a friend of the deceased."  *Id.* at B559.  Ms.

Muscatello also requested from Mr. Dowd background checks on Oscar Balarezo and Nadia Sierra. *Id.* at B423.

The only report Ms. Muscatello received from Mr. Dowd's investigation was an email from one of Mr. Dowd's employees, Yael Rom, attaching a recording of a phone call with Ms. Moses. App'x B425–26. She did not receive any information pertaining to Mr. Lugo or Mr. Peralta, nor anything related to background checks on Ms. Sierra and Mr. Balarezo. *Id.* at B424–25, B428. Nor did she find in her files a retainer agreement with Mr. Dowd. *Id.* at B457–58.

Ms. Muscatello also testified about the involvement of Irwin Blye, another investigator retained by Mr. Caballero's trial counsel ahead of the trial. Mr. Blye had been asked by trial counsel to contact Oscar Balarezo and Nadia Sierra. App'x B432–34. Ms. Muscatello never saw a report regarding an interview with either witness. *Id.* at B434.

Finally, Ms. Muscatello explained that as appellate counsel, she had reviewed the DD5s and the trial transcript, and she had not identified an ineffective assistance of trial counsel claim. *See* App'x B523–24.

## B.    Edward Dowd

Edward Dowd was a private investigator whom trial counsel's firm used during Mr. Caballero's prosecution. App'x B463–65. Mr. Dowd's testimony at the

hearing was consistent with Ms. Muscatello's account of his involvement in the case. Namely, Mr. Dowd testified that Ms. Muscatello reached out to him for "background checks and a phone call" and that the phone call was conducted by his employee, Yael Rom.  *Id.* at B466, B469.  He did not conduct the background checks because he was not paid by trial counsel for his work.  *Id.* at B466, B470.  Mr. Dowd also recalled accompanying Ms. Muscatello to a residential area in Queens on one occasion. *See id.* at B467–68.  In total, Mr. Dowd spent "a minimal amount of hours, probably under two," on the case.  *Id.* at B475–76.

### C.    Irwin Blye

Irwin Blye was a private investigator whose services Mr. Caballero's trial counsel used during Mr. Caballero's prosecution.  App'x B508–09.  He performed less than five hours of work on the case, which included meeting with trial counsel, reviewing the assignment, and, perhaps most notably, interviewing a male witness on a rooftop in Queens.  *Id.* at B509–10, B513.

On cross-examination, Mr. Blye read trial counsel's handwritten notes to refresh his recollection.  *See id.* at B514.  These notes stated: "8/30/13 Spoke to Blye – He believes Δ admitted to Gina + Oscar what happened on roof."  *Id.* at B514, B611.  However, this record did not refresh Mr. Blye's recollection as to any conversations he had with trial counsel at the time of his investigation.  *Id.* at B514.

49

### D.    Nelson LaSalle

Nelson LaSalle was a private investigator retained by defense counsel in the instant proceedings, in February 2023.  App'x B478–79.  Mr. LaSalle testified that, using a database, he was able to locate and speak with several individuals for whom there were DD5s and who could have been potential witnesses at Mr. Cabellero's trial: Christian Cavalieri, Monique Moses, Samantha Newmark, Amanda Pabon, Javier Peralta, Kimberly Pietrovito, and Nadia Sierra.  *See id.* at B483–90.  With each witness, Mr. LaSalle reviewed their respective DD5s.  *Id.* at 490.  Mr. LaSalle also testified that he was able to locate but did not speak with Wayne Dewall, who had passed away; Michael Lugo, who refused to speak with him; and Oscar Balarezo, who did not return his call.  *See id.* at B484–91.  Finally, Mr. LaSalle testified that locating each witness required between a few hours and a few weeks depending on the witnesss and that he had spent about forty hours total on the case. *Id.* at B481, B491.

### ii.    Evidence from Mr. Caballero's Trial Counsel

Lead trial counsel Robert DiDio was not available to testify at the hearing, as he passed away on January 9, 2021.  Instead, two documents were introduced into evidence.  The first was a two-page affidavit from trial counsel, which was originally filed in the instant proceedings to afford him an opportunity to respond to Mr.

Caballero's allegations of ineffective assistance.  *See* App'x B566–67; *see also* ECF No. 27.  In the affidavit, Mr. Caballero's trial counsel stated, "I recall based, on my review of the entire record, Mr. Caballero does not have a meritorious ineffective-assistance-of-counsel claim."  App'x B567.  He also stated, "Mr. Caballero never complained about a failure by my Firm or myself to conduct an investigation."  *Id.*

The second document introduced into evidence at the hearing contained trial counsel's handwritten case notes, made contemporaneously with his representation of Mr. Caballero, with entries dating from September 2012 to September 2014.  *See* App'x B609–14.  Some entries are worth noting.  For instance, various entries spanning the time of trial counsel's representation indicate that he held video conferences with Mr. Caballero.  *See, e.g.*, *id.* at B609.  Another two entries, from 2013, reference an alibi for Mr. Caballero:

> 8/29 video conf w/ client – alibi
> 8/30 review file regarding alibi –
>     (1) Gina Bruno
>     (2) Oscar Ballaraso [sic]
>     (3) incident at 9pm at 43-43 Kissena Bl
>                     2/1/95

*Id.* at B611.  Four entries reference Mr. Blye:

> 10/27/12 video conf w/ client
>     -   review entire file
>     -   speak w/ Blye
> . . .

51

8/30/13 spoke to Blye – He believes Δ [Mr. Caballero] admitted to Gina [Ms. Sierra] + Oscar [Mr. Balarezo] what happened on roof

. . .

9/4/13 video conf w/ client

- Blye to reinvestigate Gina [Ms. Sierra] + attempt to locate Oscar [Mr. Balarezo]
- Blye to give DiDio Caballero doc's [sic]

. . .

6/5/14 video conf w/ client

. . .

- Blye already pd $1500

*Id.* at B609, B611, B613.   The latter entry also includes a bullet point stating "Michael Lugo," and an entry from June 20, 2014 states: "conf w/ ct + ADA" and "Michael Lugo (other suspect)."  *Id.* at B613.

### iii.  State Court Decision

After reviewing post-hearing submissions by the parties, the 440.10 court issued a decision denying Mr. Caballero's motion.  *See* App'x B681–96.   It determined that Mr. Caballero had received effective representation under the New York State Constitution, which sets forth a less stringent burden than that of the Federal Constitution.

The court first rejected Mr. Caballero's argument that his trial counsel's alleged failure to perform an adequate investigation constituted ineffective assistance of counsel.  *See id.* at B690–93.  Specifically, the court explained that Mr. Caballero's trial counsel *did* investigate Mr. Caballero's potential alibi.  *See id.* at

52

B691–92.  Relying on trial counsel's handwritten case notes, the court inferred that trial counsel initially believed Ms. Sierra and Mr. Balarezo could serve as alibi witnesses, but following Mr. Blye's investigative work, trial counsel instead came to believe that the two would be called as prosecution witnesses.  *See id.*  Thus, trial counsel had adequately investigated Mr. Caballero's potential alibi and determined that it would not be supported by Ms. Sierra's or Mr. Balarezo's testimony.  *Id.* at B692.

The court attached little significance to the potential relevance of the proposed witnesses located by Nelson LaSalle, noting that none of them had provided an affidavit regarding their potential testimony or explaining whether they had been contacted by defense counsel at the time of the trial.  *See id.* at B693.  Further, there was no indication that any of the individuals had been present or near the scene of the crime when it happened.  *Id.* at B693.

Further bolstering the 440.10 court's conclusion of an adequate investigation was trial counsel's general competence.  *See id.* at B692–93.  Namely, trial counsel's notes indicated that he met with Mr. Caballero regularly from September 2012 through the time of the trial.  *Id.*  The court further added that Mr. Caballero had failed to demonstrate any prejudice resulting from this alleged failure to investigate.  *See id.* at B693–94.

The court next rejected Mr. Caballero's claim that cumulative errors by his trial counsel rendered his assistance ineffective.  *See id.* at B695–96.  The court explained that his trial counsel performed thorough cross-examinations of prosecution witnesses, used impeachment material, and raised pertinent inconsistencies to the jury's attention in summation.  *See id.* at B695.  "Aside from an error, which was corrected, as to the location of a staircase on the roof of the building where the murder took place, the record demonstrates that [Mr. Caballero's trial counsel] was well prepared to cross examine each witness and presented a cogent defense on the defendant's behalf."  *Id.*

Accordingly, the court concluded, Mr. Caballero had received meaningful representation under the New York State Constitution and therefore did not meet his burden of showing ineffective assistance of counsel under the federal standard.

Mr. Caballero filed for leave to appeal the 440.10 court's decision to the Appellate Division, which was denied on February 26, 2024.  App'x B2679.

## DISCUSSION

### a. Habeas and AEDPA Standards

My review of habeas petitions is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  That statute provides that an application for the writ:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the

claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The inquiries into whether a decision was "contrary to" or "involved an unreasonable application of" clearly established federal law are distinct and independent.  A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that of the Supreme Court on a question of law, or if it arrives at a contrary result while confronting a set of facts "materially indistinguishable" from a relevant Supreme Court precedent.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A decision "involves an unreasonable application" of the law where it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.* at 407–08.  These standards reflect that "state courts are the principal forum for asserting constitutional challenges to state convictions" and that the writ is "not a substitute for ordinary error correction through appeal."  *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

## b.  Sufficiency of the Evidence

This is a case where the evidence was weak, but the standard for relief on habeas review is very high.  A petitioner is entitled to habeas corpus relief on a

sufficiency of the evidence challenge only where he or she shows that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Where, as here, a state court has already passed upon the sufficiency claim, that decision is entitled to AEDPA deference.

The state's evidence in this nearly two-decade-old cold case was surely weak enough to give one pause. The prosecutor herself acknowledged before the jury that there was "no scientific evidence in this particular case linking [Mr. Caballero] to the homicide." App'x A381. The state's decision to charge Mr. Caballero after two prior inconclusive investigations was apparently motivated by the sudden appearance of a new witness, Mr. Balarezo, who had stayed silent about what he had seen for years and remained in friendly contact with Mr. Caballero during that time.

In the absence of physical evidence, the state's case rested entirely Ms. Sierra and Mr. Balarezo. Those accounts were inconsistent in ways both significant and collateral. Contradictions ranged from whether Mr. Balarezo made any statements inculpating Mr. Caballero, to the timeline of the evening's events, to the specifics of what happened after Mr. Caballero appeared in the elevator. Mr. Balarezo's testimony included strange and incongruous details that do not match up with reality,

such as stating that he wanted to "smoke some weed" on a Wednesday because it was "[his] birthday weekend."  App'x A404.

Ms. Sierra gave confusing and contradictory testimony almost across the board, and Mr. Caballero's trial counsel's most effective attacks focused on confronting her on cross-examination.  She claimed that she had known Mr. Kollman for "many, many years," babysat him, and affectionately referred to him as "[m]y little Jason."  App'x A601–02.  Yet before the grand jury, she said she had only known Mr. Kollman since she met Mr. Caballero, a few months before Mr. Kollman's death.  *Id.* at A749.  When asked, she failed to remember Mr. Kollman's last name both before the grand jury and on the stand at trial.  *Id.* at A749–51.  Later in the trial, she claimed to have remembered it "while [she] was in the break."  *Id.* at A791.

Ms. Sierra claimed that she told detectives everything in 1995, an assertion for which there is no documentation and which is difficult to square with the fact that police did not make an arrest until nearly twenty years and two investigations later.  *See* App'x A686.  Ms. Sierra later said she had meant that she told police everything in 2003.  *See id.* at A687.  Shortly after, she changed her story again and returned to insisting that she was forthcoming with detectives in 1995 after all.  *See id.* at A688.  But when the prosecutor spoke to the detectives who interviewed Ms.

Sierra in 1995, they indicated that they had no recollection of her ever telling them about Mr. Balarezo's excited utterance or Mr. Caballero appearing in the elevator covered in blood. *Id.* at A699–700. The shifts in Ms. Sierra's accounts were so erratic that Mr. Caballero's trial counsel moved for a mistrial.

Ms. Sierra also forgot that she claimed to have run into Mr. Balarezo at FIT, suddenly remembered on the stand, and then contradicted her own statements to police about whether she discussed the events in 1995 during that meeting. *See* App'x A787–89. Mr. Balarezo denied running into Ms. Sierra and claimed he had never been to FIT in his life. *See id.* at A515.

Most glaringly, Ms. Sierra claimed that Mr. Balarezo excitedly said "he killed him" after appearing from the first-floor stairwell, linking Mr. Caballero to Mr. Kollman's death. App'x A666. She testified that she had heard Mr. Balarezo coming down the stairs and that he was "breathing heavily," like he had run all the way from the roof. *Id.* at A666–67. But Mr. Balarezo's account of these moments is different from Ms. Sierra's in almost every respect. In contrast to Ms. Sierra's testimony, Mr. Balarezo testified that he ran down the stairs to the lobby, stopped running, and then walked back up to the first floor. *See id.* at A408. He did not recall anyone being present on the first floor, and he did not remember saying anything at all before the elevator doors opened, much less blurting out a statement

uniquely inculpatory of Mr. Caballero.  *See id.* at A408, A411.  Regardless of whether it meets the "no rational trier of fact" test, the state's case was weak tea indeed.  *Jackson*, 443 U.S. at 324.

In any event, I need not resolve the merits because Mr. Caballero's sufficiency claim is procedurally defaulted.  "A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal ground and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011).  This rule applies whether the state law ground is a substantive rule that is dispositive of the case or a procedural barrier to adjudication of the claim on the merits.  *Id.*  The bar falls into place where a state court "clearly and expressly" rests its judgment on a state procedural barrier, but it may be lifted again if the petitioner "can show cause for the default and prejudice attributable thereto or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."  *Harris v. Reed*, 489 U.S. 255, 262–63 (1989).

The Second Department held that Mr. Caballero's sufficiency claim was "largely unpreserved for appellate review" and cited *People v. Gray*, 86 N.Y.2d 10, 19 (1995).  *See Caballero*, 137 A.D.3d at 929.  *Gray* held that "preservation of [a] contention [on appeal] is required by appropriate objection [at trial]," pursuant to

New York Criminal Procedure Law § 470.05.  86 N.Y.2d at 18.  This requirement is sometimes called the contemporaneous objection rule, and the Second Circuit has held that it is a procedural ground for disposing of habeas claims independent from federal law.  *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011).  This rule is generally a sufficient basis to deny habeas relief unless its use falls into a "limited category of exorbitant misapplications of state law that serve no legitimate state interest."  *Id.* at 104.

Here, it appears the Second Department based its preservation holding on the fact that Mr. Caballero's trial counsel made only a "general motion[]" on insufficiency, without referring to "specific deficienc[ies]" in the evidence other than weight-based challenges to witness credibility and reliability.  *People v. Hawkins*, 11 N.Y.3d 484, 492 (2008); *People v. Williams*, 247 A.D.2d 416, 417 (2d Dep't 1998).  This is not the type of exorbitant misapplication that would allow a federal habeas court to look past a state procedural bar.  Nor does Mr. Caballero argue that he has cause or has faced prejudice to excuse his default.  Rather, he maintains that his trial counsel adequately preserved the issue, but I cannot agree.  These claims are not eligible for federal review.

### c. Confrontation Clause

For similar reasons, Mr. Caballero's Confrontation Clause claim is procedurally defaulted. Mr. Caballero argues that the trial court's curtailment of his trial counsel's cross-examination of Detective Casaza's violated his right under the Confrontation Clause to have "a meaningful opportunity to cross-examine witnesses against him." *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014). The Second Department expressly stated that this claim was "not preserved for appellate review." *Caballero*, 137 A.D.3d at 929–30 (citing *People v. Walker*, 70 A.D.3d 870, 871 (2d Dep't 2010)). In *Walker*, the court held that challenges to a detective's testimony were not preserved because "the defendant did not object to the testimony" on the grounds advanced on appeal. *See* 70 A.D.3d at 871. Here, Mr. Caballero argues that the Second Department erred in its preservation ruling because the record indicates that Mr. Caballero's trial counsel objected to the court's curtailment of his questioning of Detective Casaza. *See* App'x A835–37. However, the record does not make clear that trial counsel was objecting on Confrontation Clause grounds. *See Chrysler v. Guiney*, 806 F.3d 104, 120 (2d Cir. 2015) (explaining that "[u]nder New York law, a defendant does not preserve a Confrontation Clause claim unless he specifically objects to the introduction of the relevant evidence *on constitutional grounds*" (emphasis added)).

61

Moreover, even if Mr. Caballero were right that the Second Department should not have found the issue unpreserved—a holding I do not reach—this claim would still fail on the merits.  The Second Department held, in the alternative, that "the court's limitation of the defense cross-examination was a provident exercise of its discretion" under *Delaware v. Van Arsdall*.  *Caballero*, 137 A.D.3d at 930; *see Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").  I owe that decision AEDPA deference, and Mr. Caballero has not shown that it was an unreasonable application of *Van Arsdall*.

### d.  Hearsay Testimony

Mr. Caballero argues that the trial court violated his constitutional right to due process by admitting Ms. Sierra's hearsay testimony about Mr. Balarezo's excited utterance.  The Second Department rejected this challenge, holding that "[t]he circumstances surrounding the statement warrant the conclusion that the statement was not made 'under the impetus of studied reflection' and permit a reasonable inference that the declarant had an opportunity to observe the altercation that led to the victim's death."  *Caballero*, 137 A.D.3d at 930 (first quoting *Edwards*, 47

N.Y.2d at 497; then citing *Fratello*, 92 N.Y.2d at 571; and then citing *Young*, 308 A.D.2d at 556).   Mr. Caballero responds that the statements lacked foundation because Mr. Balarezo later testified that he did not witness Mr. Caballero killing Mr. Kollman, but rather he only saw the beginning of an altercation.

Habeas corpus is a remedy for those "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal habeas court "may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  However, in exceptional cases, an error of state law may be "sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Id.*  Even if an erroneous state law evidentiary ruling does rise to the level of constitutional error, however, it may still be found harmless unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Accordingly, Mr. Caballero must show (1) that "the trial court's improper evidentiary ruling was an error of constitutional magnitude," in that the ruling was "error under state law" and "[that] error amounted to the denial of the constitutional right to a fundamentally fair trial"; and (2) that the error was not harmless under *Brecht*. *Perez v. Phillips*, 210 F. App'x 55, 57 (2d Cir. 2006).  In

addition, AEDPA deference requires that Mr. Caballero show the Second Department's rejection of his hearsay argument was contrary to or involved an unreasonable application of clearly established federal law. *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013).

The admission of the statement under the excited utterance exception was erroneous under state law. In New York courts, like in federal courts, admission of hearsay statements as excited utterances requires a basis for the court to believe not only that the declarant was excited, but also that he or she had actually witnessed the events about which statements were made. "[I]t must be inferable that the declarant had an opportunity to *observe personally* the event described in the spontaneous declaration." *People v. Cummings*, 31 N.Y.3d 204, 209 (2018). The combination of personal knowledge of the event described and the "impulsive and unreflecting" nature of the statements is what imbues this evidence with "a high degree of trustworthiness." *Id.* "[A]lthough not essential for admissibility, there [may be] an added assurance of reliability [where] the proof of the declaration was by the declarant who, in taking the stand, [is] subject to cross-examination." *People v. Caviness*, 38 N.Y.2d 227, 232 (1975).

Here, the hearsay declarant—Mr. Balarezo—denied on the stand that he had witnessed the event he allegedly described in his excited utterance, the killing of Mr.

64

Kollman by Mr. Caballero.  *See* App'x A435.  What is more, Mr. Balarezo did not recall making the alleged statements and affirmatively testified that no one—including Ms. Sierra—was present when he witnessed Mr. Caballero exit the elevator and when he allegedly uttered those statements.  *Id.* at A411.  Finally, Mr. Balarezo testified that he was not shocked or excited when he approached the elevator on the first floor.  *See id.* at A408.  Indeed, he told the jury that he ran down to the lobby, asked himself why he was running, and then walked back up to the first floor immediately before witnessing Mr. Caballero exit the elevator.  *See id*.

I am also troubled by the state's handling of this issue on appeal.  In its appellate briefing, the state attempted to reshuffle the order of events into a sequence more favorable to admission.  In this new version of the story, the state argued, "[Mr. Balarezo] understood what [Mr. Caballero] had done to [Mr. Kollman] on the roof when he saw [Mr. Caballero] emerge from the elevator covered in blood.  [Mr. Balarezo], 'shocked' by what he saw, immediately realized that [Mr. Balarezo] [sic] had killed [Mr. Kollman] and blurted that out."  App'x A1088–89.

The state's attempt to reconstruct the facts to support admission of Ms. Sierra's testimony flatly contradicts her own description of what she saw and heard.  Ms. Sierra testified that Mr. Balarezo made statements about Mr. Caballero killing Mr. Kollman *before* the elevator doors opened and revealed Mr. Caballero covered

in blood.  *See* App'x A667–68.  She differed about the specifics of how much time passed between Mr. Balarezo's statements and the elevator doors opening—saying first that it was "[t]wo minutes," then "[l]ess than two minutes," and later "30 seconds to 45 seconds."  *Id.* at A615, A668, A670.  But Ms. Sierra remained clear that Mr. Balarezo's statements preceded the opening of the elevator doors, as illustrated by the following exchange on cross:

> [DEFENSE]:  Would it be a better way, when you say momentarily, he comes out of the stairwell, [Mr. Balarezo], right?
> [MS. SIERRA]:  Yes.
> [DEFENSE]:  And he makes the statement that you have indicated, right, he says, I can't believe he killed him?
> [MS. SIERRA]:  Right.  Right.
> [DEFENSE]:  And momentarily after that?
> [MS. SIERRA]:  Right.
> [DEFENSE]:  The doors opened, right?
> [MS. SIERRA]:  Yes, correct.
> [DEFENSE]:  So there wasn't a long conversation that you had with [Mr. Balarezo].  It was a moment later?
> [MS. SIERRA]:  I was hearing him screaming.
> [DEFENSE]:  You hear what he is saying and a moment later the door opened, right?
> [MS. SIERRA]:  Yes, correct.

*Id.* at A670–71.

The state's theory that Mr. Balarezo saw Mr. Caballero covered in blood, *then* "immediately understood" that Mr. Caballero had killed Mr. Kollman, and *then* "blurted [that] out" badly misrepresents the facts given by its own hearsay witness. App'x A1134, A1136.  What is more, Mr. Balarezo testified that he asked Mr.

66

Caballero "what had happened, what is going on," when he saw Mr. Caballero covered in blood, further undercutting the idea that Mr. Balarezo "immediately understood" what the blood meant and yelled out as much. *Id.* at A408.

The state attempted to get around this issue by pointing to Mr. Balarezo's testimony that only "two or three seconds" elapsed between his arrival on the first floor and the opening of the elevator doors. *See* App'x A1094. But Mr. Balarezo also testified that he did not witness a murder, that no one was in the hallway with him when the elevator doors opened, and that he did not recall saying anything to the effect of "he killed him"—testimony the state explicitly asked the jury to disregard in favor of Ms. Sierra's version of events. The state responded by arguing that Mr. Balarezo was so shocked by the bloody appearance of Mr. Caballero that he simply did not notice Ms. Sierra or remember saying anything about a killing. *See id.*

The state's justification was unpersuasive for two independent reasons. First, regardless of whether a few seconds or just under two minutes passed between Mr. Balarezo's appearance on the first floor and the opening of the elevator doors, Ms. Sierra clearly testified to hearing Mr. Balarezo's remark *before* the elevator doors opened and either of them saw Mr. Caballero. That alone undoes the state's theory

67

that Mr. Balarezo put two and two together upon seeing a bloody Mr. Caballero, and that the conjunction of these facts provided the foundation for his excited utterance.

Second, the state argued that Mr. Balarezo was so shocked that he could not remember what he said or who was there.  If indeed that was the case, it is hard to see why the jury should have credited his assertion that "two or three seconds" passed, over Ms. Sierra's contrary testimony that somewhere between thirty seconds and two minutes elapsed between Mr. Balarezo's appearance and the elevator doors opening, and that Mr. Balarezo made his statements before the latter event occurred. The state attempted to have its cake and eat it too, inasmuch as it asked the jury to credit Ms. Sierra over Mr. Balarezo about his own statements and actions, but then curated pieces from both of their testimonies on appeal to cobble together the version of events most favorable to the admission of hearsay.  Thus, Mr. Balarezo's excited utterance lacked the requisite personal knowledge of the event that is critical to rendering a hearsay statement reliable, and the Second Department's conclusion to the contrary was an error of state law.

Nevertheless, Mr. Caballero's challenge fails because he still received a fundamentally fair trial.  When evidence is erroneously *excluded*, "the test for determining whether the ruling denied the defendant a fair trial is whether it would have created 'a reasonable doubt that did not otherwise exist.'"  *Collins v. Scully*,

755 F.2d 16, 18 (2d Cir. 1985) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)) (pre-AEDPA case).   Correspondingly, when evidence is erroneously *admitted*, the test is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."   *Id.* at 19 ("[I]t must have been crucial, critical, highly significant.").

Other factors may also bear on whether the trial was fundamentally fair.   In *Evans v. Fischer*, the Second Circuit concluded that the erroneous admission of a hearsay statement did not render the trial fundamentally unfair because

> the declarant . . . testified at trial and was extensively cross-examined about the inconsistencies in her various statements; the hearsay statement added little of an incriminating nature to [the declarant's] sworn and cross-examined in-court testimony, and its inconsistencies with some details of that testimony added grist to the defense argument that [the declarant] was an unreliable witness; and [the declarant's] testimony (and thus the hearsay statement) was corroborated by a wealth of other evidence.

712 F.3d at 135.   Thus, the state court's evidentiary error did not amount to a denial of the petitioner's due process.

As discussed above, I have reservations about whether the evidence in this case was sufficient to support the verdict.   Assuming *arguendo* that it was, then I cannot conclude that in the absence of the hearsay statement, the jury would have

had reasonable doubt.   Although Mr. Balarezo's excited utterance squarely incriminated him in the killing of Mr. Kollman, the record still contained testimony—albeit inconsistent—from Mr. Balarezo and Ms. Sierra about seeing Mr. Caballero exit the elevator "drenched in blood" and "covered with blood."  App'x A408, A615.  Similarly, Ms. Sierra testified on the day after Mr. Kollman's murder that Mr. Caballero told her, among other things, that he "just wanted to feel how it is—how it feels to kill a man."  *Id.* at A622.  Other aspects of Mr. Sierra's and Mr. Balarezo's testimony also supported the prosecution's theory of the case.  Additionally, as in *Evans*, the hearsay declarant testified at trial and was cross-examined.  Mr. Caballero was free to—and in fact did—point out the contradictions between Ms. Sierra's and Mr. Balarezo's versions of events to the jury, using these inconsistencies as "grist to the defense argument."   *Evans*, 712 F.3d at 135.  Accordingly, Mr. Balarezo's excited utterance was operative in—but not dispositive of—the jury's decision to convict.  Its admission into evidence neither rendered his trial fundamentally unfair nor had a "substantial and injurious effect" on the jury. *Brecht*, 507 U.S. at 623.

Finally, Mr. Caballero's challenge fails for the additional reason that the state court's decision is entitled to AEDPA deference, and Mr. Caballero does not identify any "Supreme Court cases [that] establish a general principle that the reliance on

hearsay testimony to support a conviction can violate the requirement of due process." *Evans*, 712 F.3d at 135.

### e. Ineffective Assistance of Trial Counsel

Mr. Caballero argues that he was denied the effective assistance of trial counsel in violation of his Sixth Amendment right.  He presented this claim in Queens County Supreme Court, in a motion made pursuant to New York Criminal Procedure Law § 440.10, alleging that his trial counsel was ineffective for failing to investigate the case by neglecting to interview key witnesses and examine the crime scene; failing to seek a curative instruction about missing *Rosario* material; and failing to seek a limiting instruction regarding Detective Casaza's hearsay testimony. *See* App'x B255–93.  The Queens County Supreme Court denied Mr. Caballero's claim on the merits.  "Because the state court adjudicated the merits of his claim, [Mr. Caballero] must prove that the state court either identified the federal standard for ineffective assistance but applied that standard in an objectively unreasonabl[e] way, or that the state applied a rule that contradicts the federal standard." *Rosario v. Ercole*, 601 F.3d 118, 122 (2d Cir. 2010).

*Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the relevant federal law governing ineffective assistance of counsel claims.  Under *Strickland*, an ineffective assistance of counsel claim has two parts.  First, the defendant must show

that "counsel's performance was deficient," which requires showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In other words, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, "the defendant must show that the deficient performance prejudiced the defense" by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To do that, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This "performance and prejudice test" is clearly established federal law for AEDPA purposes. *Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

The 440.10 court reviewed Mr. Caballero's claims under New York's constitutional standard for ineffective assistance. New York's constitution affords its citizens the right to competent representation by an attorney. N.Y. Const. art. I, § 6; *see also People v. Baldi*, 54 N.Y.2d 137, 146 (1981). However, New York's test for ineffective assistance of counsel under the state constitution differs from the federal *Strickland* standard. The first prong of the New York test is the same as the first prong of *Strickland*: A defendant must show that his attorney's performance fell below an objective standard of reasonableness. *People v. Turner*, 5 N.Y.3d 476, 480

72

(2005). The difference arises in the second prong: Under New York's standard, "prejudice is examined more generally in the context of whether defendant received meaningful representation." *People v. Benevento*, 91 N.Y.2d 708, 713 (1998). "The question is whether the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial. . . . While the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case." *Id.* at 713–14.

The Second Circuit has repeatedly recognized that New York's meaningful representation standard is not contrary to the *Strickland* standard for purposes of § 2254(d)(1). *See, e.g.*, *Eze v. Senkowski*, 321 F.3d 110, 123–24 (2d Cir. 2003); *Henry v. Poole*, 409 F.3d 48, 69–70 (2d Cir. 2005); *Rosario*, 601 F.3d at 124–26.[6] Thus, "[t]he only avenue of reprieve available to [Mr. Caballero] then is to establish that the state court unreasonably applied *Strickland*." *Rosario*, 601 F.3d at 126. As

---

[6] The Second Circuit recently clarified that the standard applied in these cases to determine whether the state court unreasonably applied federal law—which originated in *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000), and requires that "the state court's decision reflects some increment of incorrectness beyond error, although that increment need not be great"—"did not survive the Supreme Court's decision in *Richter*, 562 U.S. at 102." *Englert v. Lowerre*, No. 22-2016-pr, 2024 WL 3818574, at *10 n.13 (2d Cir. Aug. 15, 2024). However, these cases' discussion of *Strickland* and New York's meaningful representation standard remains good law.

explained above, a state court unreasonably applies clearly established law where it identifies the correct governing legal principle from Supreme Court jurisprudence but unreasonably applies that principle to the facts of the case. *Williams*, 529 U.S. at 413. However, in order to prevail, Mr. Caballero must first satisfy the prongs of *Strickland* on *de novo* review of the merits. *Rosario*, 601 F.3d at 126.

### i. *Strickland* Claim

### A. Deficient Performance

### 1. Failure to Investigate

Mr. Caballero's trial counsel's performance fell below the *Strickland* standard in several respects. First, trial counsel failed adequately to investigate the case in the pre-trial stages. *Strickland* itself recognizes a trial counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *accord Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (noting that defense counsel's duty is premised on the conclusion that the adversarial "testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies"). *Strickland* also held that the American Bar Association (ABA) standard and similar documents may be used as "guides to determining what is reasonable." *Id.* at 688.

The relevant ABA standard in effect at the time of trial stated that "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case." ABA Standards for Criminal Justice, Prosecution Function & Defense Function 4-4.1(a) (3d ed. 1993). The commentary elaborates: "Considerable ingenuity may be required to locate persons who observed the criminal act charged or who have information concerning it. . . . It may be necessary to approach a witness several times to raise new questions stemming from facts learned from others. . . . Neglect of any of these steps may preclude the presentation of an effective defense." *Id.*, commentary. The commentary concludes: "The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role. Failure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel." *Id.*

The record makes clear that Mr. Caballero's trial counsel did not interview any witnesses prior to trial. Given the centrality of witness testimony to the state's case, that alone might be enough to require a finding that the *Strickland* standard was breached. *See Schulz v. Marshal*, 345 F. App'x 627, 629 (2d Cir. 2009) (concluding, in a case with no physical evidence, that the New York Court of

Appeals unreasonably applied *Strickland* by holding that trial counsel's failure to interview one of two eyewitnesses to a crime was not deficient).  Mr. Caballero's trial counsel requested an adjournment at "the midnight hour" to further investigate and attempt to contact witnesses, despite having been given information on several possible witnesses weeks prior.  *See* App'x A51–55, A69.  The court denied the adjournment after pointing out that trial counsel had sat on information related to several witnesses for nearly two months.  *See id.* at A63–69.  A trial counsel's judgments are entitled to "a heavy measure of deference," but here counsel presented no explanation even suggesting that his failure to seek out and interview witnesses was the result of a "[s]trategic choice[] made after thorough investigation of law and facts."  *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

Nor does the fact that the prosecutor disclosed *Rosario* material on Mr. Balarezo and Ms. Sierra on the eve of trial excuse trial counsel's deficient investigation.  As the trial court observed, Mr. Balarezo and Ms. Sierra were well known to Mr. Caballero—one was his friend and the other his former girlfriend.  *See* App'x A71.  Indeed, Mr. Caballero mentioned both of them when he spoke to police about the night of the incident, and his trial counsel had initially identified them as potential alibi witnesses.  *See id.* at A52.  According to trial counsel, Mr. Caballero

was "nothing but professional with me and fair and helpful in his own defense." *Id.* at A979. Thus, Mr. Caballero's trial counsel had a duty to at least make a reasonable attempt to investigate the witnesses known to his client and attempt to interview them. Counsel did say that Mr. Caballero's "prior attorney with an investigator tried to reach out to those two witnesses and they were uncooperative with us." *Id.* at A53. But trial counsel had been in charge of the case for almost two years by that point, and he gave no indication that he had made any further attempts to contact the witnesses since taking over.

Trial counsel's lack of effort in locating witnesses contrasts unfavorably with his attempts to push the case to trial and his continual protestations of preparedness. In the nearly two years after he took the case, Mr. Caballero's trial counsel repeatedly told the court that he was prepared and eager to move the case forward. *See, e.g.*, App'x A3 (transcript of July 31, 2013 pre-trial appearance where trial counsel told the trial court, "[w]e're anxious to get started with these hearings and move the case forward to trial . . . I have been ready just about every time," and "August 27th [2013] we'll be ready"); *id.* at A8 (transcript of August 27, 2013 pre-trial appearance where trial counsel stated, "[w]e are anxious to move forward with the case"); *id.* at A16 (transcript of January 17, 2014 pre-trial hearing appearance where trial counsel said, "I'm asking, we need to move this case not just to hearings,

but to trial").  Even as Mr. Caballero's trial counsel continually pushed the state to speed up its prosecution of his client, he declined to make additional efforts to reach out to witnesses likely to figure at that trial until the "midnight hour."  Considerable ingenuity this was not.

## 2.  Cumulative Errors

Trial counsel's failure to investigate the case may have contributed to other examples of his deficient performance.  In a bizarre exchange that culminated in his throwing a pen at the prosecutor, Mr. Caballero's trial counsel attempted to vigorously cross-examine Mr. Balarezo about the existence of a second stairwell at 43-43 Kissena.  *See* App'x A466–71.  When the prosecutor objected, Mr. Caballero's trial counsel insisted, in front of the jury, that he had personal knowledge of the layout of the building and charged that the "prosecutor [was] misleading the jury." *Id.* at A470.  The trial court admonished Mr. Caballero's trial counsel for his outburst, whereupon trial counsel threw a pen at the prosecutor. *See id.* at A470–71. Later, trial counsel returned to the issue and again attempted, unsuccessfully, to elicit testimony from Mr. Balarezo that there were two separate stairwells. *See id.* at A486.  This line of questioning about staircases also featured in trial counsel's cross-examination of the prosecution's first witness, Mr. Muhammad Jalil, as well as Detective Dewhurst. *See id.* at A395–97, A562–68, A572–74.  In the trial court's

words, the jury "heard [nine] million questions" on the subject during trial counsel's cross-examinations.  *Id.* at A522.

At the court's direction, an officer visited the location and determined that there was in fact only one stairwell, at which point Mr. Caballero's trial counsel admitted, "I was wrong.  I had been to the location about a week prior, and I had the impression that it was two staircases, just the way we had conducted our investigation."  App'x A527.  The trial court said that it "[did] not ascribe any bad faith . . . for asking those questions, but the fact remains these questions now appear to have been completely without foundation."  *Id.*

In sum, the record indicates that Mr. Caballero's trial counsel prepared a meritless defense predicated on an obvious mistake of fact resulting from the way he had "conducted [his] investigation."  App'x A527.  He wasted substantial time during his cross-examination of several witnesses—including one of the state's two principal witnesses—laying the groundwork for that meritless defense.  When his mistake was revealed, he attempted to transform himself into a fact witness, accused the prosecutor of misleading the jury, and threw a pen at her.  In the end, Mr. Caballero's trial counsel was forced to stipulate to a correction of his mistake, likely severely damaging his credibility with the jury and leaving jurors confused about the point of his extended questioning on the subject.  *See id.* at A538.

79

Mr. Caballero's trial counsel also badly mishandled the possible involvement of Mr. Lugo.  The record that was before the jury only briefly mentions Mr. Lugo as someone who got into a fistfight with Mr. Kollman shortly before his death.  That fact alone would have been enough to tip off a reasonable defense attorney that Mr. Lugo merited investigation as a possible alternative perpetrator.  Mr. Caballero's trial counsel must have known about the fight through his client because the DD5 from Mr. Caballero's initial interview with police in 1995—which was not in evidence at his trial—states that he told investigators that "Jason [Kollman] and Mike [Lugo] had words and then had a fight."  App'x A1522.

Looking under the hood at what was *not* presented to the jury makes it downright perplexing that Mr. Caballero's trial counsel ignored Mr. Lugo's value as an alternative perpetrator.  The *Rosario* materials included another DD5 from 1995 indicating that a "subject of interest" stated, "Michael Lugo killed Jason Kollman.  The [subject of interest] stated that Lugo argued with Jason and that he killed him.  The [subject of interest] also stated that Jasons [sic] mother had on her answering machine a threat made [b]y Michael Lugo to Jason."  *Id.* at A1524.  Another DD5 records that Angel Hernandez told police that "everybody knows Mike Lugo killed [Mr. Kollman]" and that a woman from the neighborhood named Amanda Pabon had told him "that Mike and his cousin had killed Jason."  *Id.* at A1525.

The cold case squad interviewed Ms. Pabon in 2011, when she told detectives about an encounter between Mr. Lugo and Mr. Kollman she had witnessed before the latter's death.[7]  *See* App'x 1526.  She told detectives, "[B]efore Jason's death, she was at a pizzeria with Jason.  Mr. Michael Lugo came in and asked to speak with Jason.  Jason appeared nervous to Mrs. Pabon, due to a dispute Jason had on going [sic] with Mr. Lugo about drugs.  Mr. Lugo did speak to Jason and then left after speaking to him.  Mrs. Pabon believes that Mr. Lugo may have had something to do with Jason's death."  *Id.*  Yet another DD5 records that a few days after Mr. Kollman's death, the precinct received "a telephone call from an anonymous male caller who stated he heard people talking in the neighborhood about the [h]omicide at 43-43 Kissena Blvd stating that Mike Lugo killed Jason."  *Id.* at A1530.

A third witness told police that Mr. Kollman and Mr. Lugo were known to be involved in drugs together.  Javier Peralta reported to officers, "[W]ord in the street . . . is that Jason sold an amount of cocaine to one Michael Lugo.  This amount of cocaine turned out to be baking soda, which resulted in Lugo having a fist fight with

---

[7] Ms. Pabon is also referred to as "Amanda Lazarus" and "Amanda Hurwitz." App'x A1526.

Jason, about 45 minutes prior to Jason's death. . . .  Mr. Peralta believes that Anthony or Lugo, or both, are responsible for Jason's death."[8]  App'x A1531–32.

Finally, it seems Mr. Lugo *himself* knew that he was a likely suspect of Mr. Kollman's murder.  Days after Mr. Kollman's death, police "received a telephone call from a male stating that he was Michael Lugo."  App'x A1537.  The caller told an officer that he knew detectives "wanted to question him regarding the Jason Kollman homicide and he had attempted to get a lawyer" but could not afford one. *Id.*  The caller informed the officer that "Jason Kollman was a good friend of his and that he had not been the person who had killed him."  *Id.*

Mr. Caballero's trial counsel had the case for two years before trial, during which time he had access to a client whom he claimed was helpful in his own defense.  *See* App'x A979.  In addition, all the materials just discussed were turned over to trial counsel six weeks before trial.  *Id. at* A50–51.  Despite this, trial counsel still had not attempted to locate and interview Mr. Lugo by the time he asked for an adjournment on the eve of trial.  *See id.* at A58.  The prosecutor revealed that she had even offered to make Mr. Lugo available to Mr. Caballero's trial counsel if necessary because he was on the prosecution's witness list, and trial counsel had not

---

[8] The record does not clarify who "Anthony" is.  Mr. Caballero's first name is Andrew.

taken her up on it.  *See id.* at A59.  Mr. Caballero's trial counsel claimed to have no recollection of the offer.  *See id.* at A60.

At trial, Mr. Caballero's trial counsel made a decidedly faint-hearted attempt to draw the jury's attention to Mr. Lugo as a possible alternative suspect.  In his discussion of the fight between Mr. Lugo and Mr. Kollman shortly before the latter's death, trial counsel focused on the fact that Mr. Caballero had broken up the conflict and protected Mr. Kollman, which he suggested made the state's argument that Mr. Caballero intentionally killed Mr. Kollman implausible.  *See* App'x A889.  The closest Mr. Caballero's trial counsel came to suggesting that Mr. Lugo might have killed Mr. Kollman was to say that "[t]he only friction that there was with Jason that night was between him and Michael Lugo and that occurred within an hour of Jason being killed on the roof, and that again is something for you to consider."  *Id.* at A889–90.

Thus, despite testimony from multiple witnesses that Mr. Lugo had gotten into a fistfight with Mr. Kollman forty-five minutes before he was killed, and all of the background materials suggesting that Mr. Lugo had a motive to harm Mr. Kollman, Mr. Lugo barely featured in the trial at all.  The jury was left with the impression that he was a background character.  His fistfight with Mr. Kollman about a drug issue forty-five minutes before the latter's death was presented as relevant mainly

because it put all the principal players at the same place shortly before they separately returned to 43-43 Kissena.  In fact, jurors heard more about the illusory second stairwell than they did about Mr. Lugo.  In over sixty pages of transcript covering Mr. Caballero's trial counsel's closing argument, Mr. Lugo's name appears on only four of them.  *See* App'x A850, A859, A889–90.  At no point did Mr. Caballero's trial counsel directly state, or even seriously suggest, that Mr. Lugo was a more plausible suspect for Mr. Kollman's killing.

This approach is doubly curious because even the prosecutor seemed to anticipate that Mr. Caballero's trial counsel would put Mr. Lugo forward as an alternative perpetrator.  Arguing against trial counsel's adjournment request, the prosecutor claimed that Mr. Lugo's involvement "is a collateral issue."  App'x A59. She argued, "This is a fight that happened an hour before.  The only time that becomes relevant is if the defense is going to try to blame Mike Lugo."  *Id.*  While explaining that the prosecution could not locate the recording of the threatening voicemail Mr. Lugo allegedly left for Mr. Kollman on his mother's machine, the prosecutor remarked, "I am not sure how [the recording] is relevant to this particular case.  Unless the defense is blaming Mike Lugo of some sort."  *Id.* at A80–81.  The police and the prosecutor thought enough of Mr. Lugo as an alternative suspect to run his fingerprints against the latent print recovered from the roof door at 43-43

Kissena and to elicit testimony from one of the forensic witnesses at trial that Mr. Lugo was not a match for that print. *See id.* at A800. All of this suggests that investigators took Mr. Lugo seriously as a suspect, and that the prosecutor expected to have to parry a thrust toward Mr. Lugo that never materialized at trial.

Indeed, while defending Mr. Caballero's trial counsel's performance in the coram nobis proceeding, the state did not even attempt to argue that he had made a well-informed strategic choice not to present Mr. Lugo as an alternative suspect. Instead, it pointed to trial counsel's lone statement about "friction" between Mr. Lugo and Mr. Kollman to argue that trial counsel "intimated that [Mr.] Lugo was a stronger suspect than defendant." App'x A1300. The state repeats that characterization in its briefing to this court. *See* ECF No. 10 at 64–65. But dedicating one line of closing to suggesting that Mr. Lugo's "friction" with Mr. Kollman was "something to consider" is a far cry from presenting him to the jury as a plausible alternative suspect whose presence in the case could raise a reasonable doubt about Mr. Caballero's guilt.

In the face of all this, I cannot credit Mr. Caballero's trial counsel's decision not to pursue any angle related to Mr. Lugo as a reasoned tactical choice. Enough signs pointed Mr. Lugo's way to make his involvement "significant and obvious" and to at least merit trial counsel's close attention and investigation. *Mayo v.*

85

*Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  Trial counsel's strategy focused on portraying Ms. Sierra and Mr. Balarezo as unreliable and inconsistent witnesses, which at times he did effectively.  But "[a] tactical decision to pursue one defense does not excuse failure to present another defense that would bolster rather than detract from the primary defense." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993).

Mr. Caballero's trial counsel could easily have argued that Mr. Lugo was the real perpetrator and that Ms. Sierra and Mr. Balarezo lied about Mr. Caballero because they were afraid of Mr. Lugo.  Indeed, this approach would have bolstered rather than detracted from trial counsel's defense because fear of Mr. Lugo would have been a more plausible motivation for lying than those reasons that trial counsel actually pursued.  It would have also helped to explain why Mr. Balarezo remained friends with Mr. Caballero—even going so far as to bring his daughter to the park with Mr. Caballero—for years even after purportedly realizing that Mr. Caballero had murdered someone.   Mr. Caballero's trial counsel failed to do even the rudimentary investigatory work that would have fleshed out that theory, much less persuasively present it at trial.  For this and other reasons discussed, trial counsel's performance fell below the constitutional minimum.

### B.    Prejudice

Trial counsel's deficient performance prejudiced Mr. Caballero.  In assessing whether counsel's errors raised a reasonable probability of a different result under *Strickland*, I consider them "in the aggregate" and weigh their cumulative effect. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).  Applying that standard, the aggregate impact of trial counsel's (1) failure to investigate, (2) use of valuable cross-examination time to set up a defense predicated on his mistake of fact and resulting unprofessional conduct in front of the jury, and (3) failure to present Mr. Lugo as a plausible alternative suspect amply establishes prejudice to Mr. Caballero. Taken together, these errors "underscore[] a fundamental lack of formulation and direction in presenting a coherent defense." *Id.* (quoting *Stouffer v. Reynolds*, 168 F.3d 1155, 1163–64 (10th Cir. 1999)).

Had Mr. Caballero's trial counsel diligently attempted to contact witnesses known to Mr. Caballero, he would likely not have been so unprepared to meet the testimony of Mr. Balarezo and Ms. Sierra.  In this respect, "[c]ounsel's failure to investigate prevented an effective challenge to the credibility" of the state's witnesses. *Id.* at 204.  Likewise, had trial counsel conducted more careful review of the *Rosario* materials and sought out additional witnesses, he would have had a better opportunity to present Mr. Lugo as an alternative perpetrator.  Finally, had

trial counsel properly investigated the layout of 43-43 Kissena, he would not have wasted precious trial time pursuing a quixotic cross-examination of Mr. Balarezo that culminated in an angry outburst in front of the jury and forced him to stipulate to his own mistake in open court.  But in the event, "counsel's errors impaired his ability to mount an effective cross examination."  *Id*.

The weakness of the state's case reinforces the conclusion that trial counsel's deficiencies prejudiced Mr. Caballero.  "This is a case of underwhelming evidence." *Lindstadt*, 239 F.3d at 205.  The state had no physical evidence tying Mr. Caballero to the crime.  Rather, the state's entire case turned on convincing jurors to credit Mr. Balarezo's and Ms. Sierra's recollections of events that took place nearly twenty years earlier, and trial counsel's defense relied on convincing the jury that these two witnesses were either lying or misremembering.  Mr. Lugo, meanwhile, offered trial counsel an alternative explanation for what might have happened that night.  Just as Mr. Caballero's trial counsel suggested that Ms. Sierra might lie out of anger at Mr. Caballero's infidelity and Mr. Balarezo out of fear that he would be blamed for Mr. Kollman's death, he could have suggested that both of them might lie out of fear of Mr. Lugo, but that avenue was left wholly unexplored at trial.  There is a reasonable probability that a robust presentation of Mr. Lugo as an alternative suspect would

88

have created reasonable doubt in the minds of jurors and therefore led to a different result.

The way jury deliberations unfolded also points to a close case, the outcome of which was far from assured.  The "length and deliberative conduct" of a jury's consideration can give some clues as to whether it thought the case was close or easily decided.  *See Zappulla v. New York*, 391 F.3d 462, 471 (2d Cir. 2004).  That, in turn, gives some indication whether a different outcome was reasonably probable.  Here, the jury deliberated for three days.  At the end of the first day, the jury sent the judge a note requesting "Elevator statements of both Nadia [Sierra] and Oscar [Balarezo] . . . and then how did Nadia and Oscar meet.  Both testimonies."  App'x A951.  That same day, the jury asked the trial court to read its charge in full a second time.  *See id.* at A952–53.  At the end of the second day, the jury sent the trial court a note indicating that it could not reach an agreement.  *See id.* at A964–65.  Only on the third day did the jury announce that it had reached a verdict.  *Id.* at A966.  The lengthy deliberations and the requests indicate that the jury thought the case close, which weighs in favor of finding prejudice from trial counsel's ineffective assistance.

In aggregate, trial counsel's errors prejudiced Mr. Caballero.  "Counsel's lack of familiarity with the case, combined with his failure to investigate, provided [Mr.

Caballero] with a trial significantly different than [he] might have received if represented by a competent attorney." *Lindstadt*, 239 F.3d at 204 (quoting *Williams v. Washington*, 59 F.3d 673, 682–85 (7th Cir. 1995)).   There is a "reasonable probability . . . sufficient to undermine confidence in the outcome" that "the result of the proceeding would have been different," absent trial counsel's errors. *Strickland*, 466 U.S. at 694.

### ii.   AEDPA Standards

Under AEDPA, even if a habeas petitioner establishes a *Strickland* violation, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits" by the state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d).   This requires the federal court "to assess whether the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Garner v. Lee*, 908 F.3d 845, 861 n.14 (2d Cir. 2018) (quoting *Richter*, 562 U.S. at 103).[9]

---

[9] As noted above, *see supra* note 6, the Second Circuit has explained that *Richter*'s "no reasonable jurist" standard displaced the prior and oft-cited "some

The 440.10 court's rejection of Mr. Caballero's ineffective assistance of counsel claim was an objectively unreasonable application of *Strickland*. With respect to the first prong, deficient performance, the court's conclusions unreasonably applied *Strickland* in three ways. First, in concluding that Mr. Caballero's trial counsel conducted an adequate investigation, the court conflated trial counsel's investigation into Mr. Caballero's alibi with an adequate investigation into the case as a whole. While investigating an alibi is one aspect of adequate representation, *see Lindstadt*, 239 F.3d at 200–01, it is not the only one. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The relevant ABA standard, which the Supreme Court has frequently cited, provides that defense counsel should "explore *all* avenues leading to facts relevant to the merits of the case." ABA Standard 4-4.1(a) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 & n.6 (2005); *Wiggins*, 539 U.S. at 522, 524; *Williams*, 529 U.S. at 396; *Strickland*, 466 U.S. at 688.

Here, the only investigation that the 440.10 court's decision describes is the one conducted by Irwin Blye into Mr. Caballero's potential alibi. *See* App'x B691–

---

increment of incorrectness" standard from *Francis S.*, 221 F.3d at 111. *See Englert*, 2024 WL 3818574, at *10 n.13; *Garner*, 908 F.3d at 861 n.14.

92.   But absent from that investigation—or any other investigation performed by trial counsel—were interviews with the potential witnesses later interviewed by Nelson LaSalle.   The court excused this, concluding that "the defendant has failed to demonstrate the absence of a strategic or other legitimate explanation for trial counsel's alleged failure to interview these witnesses."   *Id.* at B693.   It suggested that Mr. Caballero's argument would have been strengthened by affidavits from the witnesses about whether they had ever been contacted by Mr. Caballero's trial counsel, affidavits from the witnesses about their potential testimony, or evidence in the record that the witnesses had been present or near the scene of the crime when it happened.   *See id.*

The absence of such affidavits or evidence does not excuse trial counsel's failure to interview the witnesses.   By seeking affidavits about contact between the witnesses and Mr. Caballero's trial counsel, the 440.10 court implies that such contact in fact may have occurred.   But trial counsel's case notes—which, as described below, the court otherwise saw fit to rely on and draw inferences from to understand the scope of trial counsel's investigation—contain no mention of these witnesses, aside from Ms. Sierra, Mr. Balarezo, and Mr. Lugo.   At the least, it was contradictory and erroneous for the court to treat the case notes as comprehensive

92

with respect to trial counsel's investigation, while somehow simultaneously suggesting that they may have omitted information about whom he contacted.

Likewise, it was error for the 440.10 court to fault Mr. Caballero for failing to provide affidavits about the witnesses' potential testimony or evidence that the witnesses had been present at the crime scene. Though such affidavits may be helpful, "it is well-established that the refusal even to *interview* a witness with potentially exculpatory information cannot be considered 'strategic' and thus generally constitutes deficient performance." *Lopez v. Miller*, 915 F. Supp. 2d 373, 420–21, 427 (E.D.N.Y. 2013).

Additionally, the scope of a reasonable investigation is not limited to only those individuals who were at or near the crime scene; nor is a belief that these witnesses could only have provided inadmissible hearsay testimony an excuse for failing to interview them. After all, it is only by conducting the interviews that Mr. Caballero's trial counsel could have made an informed decision about calling these witnesses at trial.[10]  *See Rosario v. Ercole*, 582 F. Supp. 2d 541, 577 (S.D.N.Y. 2008), *aff'd*, 601 F.3d 118 (2d Cir. 2010) ("[C]ounsels' failure to locate and

---

[10] Mr. Caballero also argues that the relative ease with which Mr. LaSalle located most of the witnesses in 2023 forecloses any argument that Mr. Caballero's trial counsel was unable to locate the witnesses at the time of the trial, in 2014. As the state does not make such an argument, I need not address it here.

interview the potential witnesses . . . cannot be deemed strategic; it was only by contacting the witnesses that counsel could determine whether they could help petitioner's case or lead counsel to additional defense witnesses or evidence."); *Pavel v. Hollins*, 261 F.3d 210, 221 (2d Cir. 2001) (concluding, in a pre-AEDPA case, that counsel's performance was deficient because "[counsel] should have directly contacted [the witness]—to learn more about the testimony that she would have offered, and to determine whether she might serve as a suitable witness based, *inter alia*, on [counsel's] assessment of her credibility").  For these reasons, the 440.10 court's conclusion that Mr. Caballero's trial counsel conducted an adequate investigation was wholly lacking in justification.

Moreover, even as only an *alibi* investigation, it is questionable whether Mr. Caballero's trial counsel's investigation was adequate.  His case notes state that Mr. Blye "*believes* [Mr. Caballero] admitted to [Ms. Sierra] + [Mr. Balarezo] what happened on roof."  App'x B611 (emphasis added).  At the hearing on the 440.10 motion, Mr. Blye testified that he did less than five hours of work on the case, which included interviewing a male witness on a rooftop.  *See id.* at B508–10.  This evidence establishes, at most, that Mr. Blye *believed* Mr. Caballero's alibi would fail—it does not establish that the male witness on the rooftop was Mr. Balarezo, or that Mr. Blye ever spoke to Ms. Sierra.  To the contrary, when seeking an

94

adjournment just before the start of trial, Mr. Caballero's trial counsel represented to the court that he had not spoken to Ms. Sierra or Mr. Balarezo—but rather that Mr. Caballero's "prior attorney with an investigator tried to reach out to those two witnesses and they were uncooperative with us." *Id.* at A53. Thus, the record hardly supports the conclusion that Mr. Caballero's trial counsel conducted an adequate investigation into Mr. Caballero's potential alibi. The 440.10 court's determination relies on inferences from the handwritten case notes that are both unwarranted and contradicted by trial counsel's on-the-record statements.[11]

The second way in which the 440.10 court's application of *Strickland* was unreasonable stems from its conclusion that Mr. Caballero's trial counsel had a strategy and did not see a need to investigate further "given what [he] already knew about the case." App'x B693. As stated above, the refusal to even interview a witness with potentially exculpatory information cannot be deemed strategic. *Lopez*, 915 F. Supp. 2d at 427. Moreover, the conclusion that Mr. Caballero's trial counsel had a strategy is belied by his own actions—namely, the request for an adjournment

---

[11] Mr. Caballero also raises the argument that his trial counsel's lack of sufficient funds was not an excuse for failing to undertake a proper investigation. Indeed, the testimony elicited at the hearing on the 440.10 motion indicates that trial counsel did not pay Mr. Dowd. *See, e.g.*, App'x B470. To the extent that an inability to pay investigators hampered the investigation, that was not a legitimate reason to forego an investigation. *See Thomas v. Kuhlman*, 255 F. Supp. 99, 111–12 (E.D.N.Y. 2003).

on the eve of trial.  Trial counsel's arguments in favor of a trial were not, as the state contends, "merely the arguments of an attorney trying to persuade the court to grant his adjournment request."   Representations made by counsel on the record are presumed to be credible, and there is nothing in this record to suggest otherwise.  *See United States v. Johns*, 336 F. Supp. 2d 411, 424 (M.D. Pa. 2004) ("The court is entitled to rely on the representations of counsel, as officers of the court . . . ."); *Theodore v. New Hampshire*, 614 F.2d 817, 822 (1st Cir. 1980) ("Attorneys are officers of the court and a judge has the right, in most circumstances, to rely on their representations to him.").  Inasmuch as trial counsel's statements were strategic arguments, they were also earnest requests for an adjournment and, consequently, illustrations of his deficient performance.  No fairminded jurist could conclude otherwise.

Finally, the 440.10 court's application of *Strickland* was unreasonable because it "look[ed] past a prejudicial error [simply because] counsel conducted himself in a way that bespoke of general competency throughout the trial." *Rosario*, 601 F.3d at 125–26.  Highlighting trial counsel's alibi investigation, the court explained, "whatever [trial counsel's] trial strategy or explanation behind his decisions were, at a minimum it cannot be said that they were inconsistent with those of a reasonably competent attorney."   App'x B692.   The court also cited trial

96

counsel's "regular conferences" with Mr. Caballero. *See id.* Similarly, before this Court, the state emphasizes that Mr. Caballero's trial counsel conducted vigorous cross-examinations, established inconsistencies in witness testimony, and gave a lengthy, thorough, and effective summation. But instances of competent and strong advocacy do not excuse trial counsel's prejudicial failure to interview highly relevant witnesses. *See Rosario*, 601 F.3d at 140 (Straub, J., dissenting in part and concurring in part); *Green v. Lee*, 964 F. Supp. 2d 237, 261–62 (E.D.N.Y. 2013).

Turning to the second prong of *Strickland*, the 440.10 court's conclusion that Mr. Caballero was not prejudiced by his trial counsel's performance was likewise an unreasonable application of clearly established federal law. The court summarily concluded that Mr. Caballero "failed to demonstrate any prejudice from [the] purported deficiency in [trial counsel's] pre-trial investigation." App'x B694. It also found that the cumulative effect of various errors by Mr. Caballero's trial counsel did not constitute deficient performance, and therefore it did not address whether those errors may have been prejudicial to Mr. Caballero. *See id.* at B695–96.

This conclusion was an unreasonable application of *Strickland* because it failed to consider the net effect of trial counsel's errors on the jury's understanding of the case. In light of what was, as discussed above, a relatively weak case

97

presented by the prosecution, had Mr. Caballero's trial counsel presented a meaningful challenge to the credibility of the state's witnesses or viably offered Mr. Lugo as an alternative suspect, the jury may well have reached a different result. Meanwhile, trial counsel's errors and actions, such as his repeated insistence on the existence of a second stairwell and the incident that culminated in his throwing a pen at the prosecutor, may have cost him credibility with the jury and diminished the effectiveness of his arguments. *Cf. Henry*, 409 F.3d at 71–72 (concluding that the state court's application of *Strickland*'s prejudice prong was unreasonable where the state court neglected to recognize that counsel's presentation of an alibi for the wrong date "may well have diminished [the] effectiveness" of the defense).

Accordingly, I conclude that the 440.10 court's rejection of Mr. Caballero's ineffective assistance of trial counsel claim is not entitled to AEDPA deference, and his petition for a writ of habeas corpus is granted on these grounds.

### f. Ineffective Assistance of Appellate Counsel

Turning to Mr. Caballero's ineffective assistance of appellate counsel claim, I conclude that it likewise is not entitled to AEDPA deference. This claim was based on Mr. Caballero's appellate counsel's failure to raise an ineffective assistance of trial counsel claim in his direct appeal, which he contended was caused by appellate counsel's conflict of interest as a member of the same firm that represented him at

trial.  Indeed, Mr. Caballero's appellate counsel served as second chair to trial counsel and her name appears in the trial transcripts.  *See, e.g.*, App'x A633.

The Second Department rejected this claim.  It held that Mr. Caballero "failed to establish that he was denied the effective assistance of appellate counsel," *Caballero*, 157 A.D.3d at 812 (first citing *Barnes*, 463 U.S. 745; and then citing *Stultz*, 2 N.Y.3d 277), and the Court of Appeals denied leave to appeal, *Caballero*, 31 N.Y.3d at 1146.  As explained above, my review of that decision must be extremely deferential because "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101.

Because the Second Department did not provide reasoning for its decision, I examine "what arguments or theories . . . could have supported" the decision. *Id.* at 102.  Under *Jones*, appellate counsel does not have the "duty to raise every 'colorable' claim suggested by a client." 463 U.S. at 754.  The Second Department's citation of that decision suggests that it concluded that an ineffective assistance of trial counsel claim may have been colorable, but not so strong that the decision to forgo raising it could not be viewed as a permissible use of appellate counsel's "professional judgment." *Id.* at 751.

In reviewing a state court's application of *Strickland*, my review must be extremely deferential because "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101. Thus, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court." *Id.* Indeed, my review of an ineffective assistance claim must be "doubly deferential" because AEDPA affords "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

I conclude that, even under the double deference standard imposed by AEDPA, Mr. Caballero's appellate counsel's performance was constitutionally deficient, that this deficient performance prejudiced Mr. Caballero, and that the Second Department "applied *Strickland* to the facts of his case in an objectively unreasonable manner" by holding to the contrary on coram nobis. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). I cannot "conclude . . . that fairminded jurists could disagree as to whether there is a reasonable probability that, had counsel raised

100

the [ineffectiveness] issue, the outcome of the appeal would have been different." *Lynch v. Dolce*, 789 F.3d 303, 319 (2d Cir. 2015). I reach these conclusions "based upon a full review of the law and the record of this case" and with "full respect for the state's primary role in reviewing its own convictions." *Id.* at 312.

### i. Deficient Performance

### A. Failure to Raise an Ineffective Assistance of Trial Counsel Claim

In general, "it is not the defendant's role to decide what arguments to press." *Garza v. Idaho*, 586 U.S. 232, 245 (2019). Accordingly, the failure to raise a legal claim on appeal is only deficient where a petitioner can show that it falls "outside the wide range of professionally competent assistance," such that it "cannot be viewed reasonably as a strategic decision." *Strickland*, 466 U.S. at 690; *Claudio v. Scully*, 982 F.2d 798, 805 (2d Cir. 1992). This burden may be met by showing that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Lynch*, 789 F.3d at 311.

Mr. Caballero meets his burden here. For the reasons discussed above, "there is no question that the issue [of ineffective assistance of trial counsel] had merit." *Id.* at 313. Trial counsel's failure to investigate, his unfruitful focus on the stairwells, his outburst at trial, and his failure to present Mr. Lugo as an alternative suspect are all "patently obvious on the face of the record." *Id.* at 314. Indeed, the record is

replete with instances of the trial court admonishing Mr. Caballero's trial counsel for, among other things, failing to properly investigate witnesses and waiting until the "midnight hour" to ask for additional time to do so. *See, e.g.*, App'x A69. Mr. Caballero's appellate counsel should have raised these claims based on the record, and there was no compelling reason to save them for collateral review. While appellate counsel did challenge the sufficiency and weight of the evidence, she should have raised ineffective assistance as a "distinct, alternative argument for relief." *Lynch*, 789 F.3d at 314. Failure to do so was constitutionally deficient.

### B.   Conflict of Interest

The failure to raise a clearly meritorious claim that is obvious on the face of the record in favor of other, weaker claims is enough to establish deficient performance of appellate counsel. However, Mr. Caballero's appellate counsel's performance was also deficient because she labored under a conflict of interest. At the time of the appeal, appellate counsel was a member of the same firm that represented Mr. Caballero at trial and had participated in the trial as second chair to trial counsel.

As the Supreme Court has noted in the § 2255 context, "an attorney who handles both trial and appeal is unlikely to raise an ineffective-assistance claim against himself." *Massaro v. United States*, 538 U.S. 500, 502–03 (2003). In cases

102

where there is no indication that trial counsel's assistance was ineffective, or a defendant can offer only "conclusory allegations" of ineffective assistance, that presents no issue. *Garfield v. Poole*, 421 F. Supp. 2d 608, 614 (W.D.N.Y. 2006); *see also Cook v. Burge*, No. 03-CV-6095, 2010 WL 1438108, at *8 (W.D.N.Y. Apr. 8, 2010) ("It is perfectly acceptable, not to mention common, for a defendant to be represented by the same assigned counsel at trial as well as on appeal.").

But that general rule must give way when, as here, a potential ineffective assistance claim practically jumps off the pages of the record.  In those cases, a conflict arises because an attorney's assessment of the merits of the claim is likely to be impaired by the risk of significant professional and reputational damage associated with a finding of ineffective assistance.  New York's Rules of Professional Conduct, which applied to appellate counsel during the direct appeal, incorporate this principle.  Rule 1.7(a) provides that a lawyer shall not represent a client if a "reasonable lawyer would conclude that . . . there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."  N.Y. Rules of Pro. Conduct R. 1.7(a).  Such a conflict is waivable if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to [the] client; . . . [and the] client gives informed consent, confirmed

103

in writing." *Id.* at R. 1.7(b)(1), (4).  No one disputes that Mr. Caballero never gave informed consent, confirmed in writing, to any conflict.

The New York State Bar Association addressed a question similar to the one presented here in an Ethics Opinion released about two months before Mr. Caballero's appellate counsel filed her brief on direct appeal.  The Opinion examined whether "a defense lawyer [may] participate in a plea bargain process in which the lawyer advises the defendant as to a waiver of the defendant's right to challenge the conviction on grounds including ineffective assistance of counsel."  N.Y. State Bar Ass'n, Comm. on Pro. Ethics, Op. 1048 ¶ 4 (2015).  The Opinion recognized that "a criminal defense lawyer no doubt has a personal interest in avoiding challenges to the effectiveness and propriety of his or her professional services.  Even a challenge that is neither meritorious nor successful could require the lawyer to spend time responding, and could cause the lawyer reputational damage." *Id.* ¶ 13.  The Opinion declined to adopt a per se rule barring defense participation, and instead it directed lawyers to balance a number of factors, including whether "the client has acknowledged guilt, if the conviction involves a minimal sentence for a minor charge, or if it resulted from a plea bargain very favorable to the defendant." *Id.* ¶ 15.  Evidence of highly skilled representation makes a conflict less likely, while clearly deficient representation can present "a significant risk of adverse effect on

104

professional judgment." *Id.* Once a conflict arises, it may still be waivable by "informed consent, confirmed in writing," provided the other requirements of Rule 1.7(b) are met. *Id.* ¶¶ 18–24.

Applying that balance here makes the existence of a conflict clear. Mr. Caballero was convicted of second-degree murder and sentenced to 25 years to life in prison nearly twenty years after Mr. Kollman's death. He maintained his innocence throughout the proceedings and continues to do so today. The charges resulted from a cold case investigation that took place after two other investigations failed to conclusively identify a suspect. There was no physical evidence tying Mr. Caballero to the crime. The state's two star witnesses—upon which its entire case rested—gave accounts threaded with inconsistencies. Unlike the recipient of a plea bargain who waives the right to raise ineffective assistance claims, Mr. Caballero gained no special consideration for retaining appellate counsel's firm on appeal. The high likelihood that a vigorous defense would require appellate counsel to raise an ineffective assistance of trial counsel claim against the named partner of her own firm, in a case in which she assisted him, presented "a significant risk of adverse effect on professional judgment," and therefore gave rise to a conflict. *Id.* ¶ 15. Without an effective waiver by Mr. Caballero, proceeding with the representation while laboring under that conflict constituted deficient performance.

In the state courts, and again here, the state suggests that Mr. Caballero "knowingly retained trial counsel to represent him on appeal" and that "appellate counsel refuted any claim of claim of ignorance regarding potential conflicts."  ECF No. 10 at 66–67.  This characterization is belied by the record.  In her affirmation to this Court, Mr. Caballero's appellate counsel asserted only that she discussed potential conflicts with Mr. Caballero's wife and mother, and that she would normally have done so with a client.  ECF No. 25 ¶¶ 9–10.  She clarified, "I believe I had this same discussion with Mr. Caballero over the telephone . . . but I cannot be sure."  *Id.* ¶ 10.  That falls far short of "refuting" Mr. Caballero's claim that he never waived the conflict, and it fails to demonstrate that he was adequately informed of the potential consequences such a waiver would carry.  Mr. Caballero's wife and mother were not appellate counsel's clients, nor were either of them facing the prospect of life in prison.  Mr. Caballero was, and so it was his knowledge and consent that mattered.

Moreover, appellate counsel had the independent duty to ensure that she reasonably believed she could provide competent and diligent representation, regardless of what Mr. Caballero did or did not know.  Appellate counsel claims that "after reviewing the record and the law, and evaluating the trial proceedings in good faith, I simply did not identify any meritorious claims of ineffective assistance [of

trial counsel]." *Id.* ¶ 15.  I find that claim hard to credit as the result of a "reasonable" and disinterested assessment because the record makes plain that Mr. Caballero's trial counsel's representation was deficient in important respects.

## ii.   Prejudice

Mr. Caballero must show that his appellate counsel's deficient performance prejudiced him.  As with trial counsel, this claim requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Here, prejudice can be presumed because Mr. Caballero shows that his appellate counsel was "burdened by an actual conflict of interest." *Id.* at 692.  Even if no conflict were present, the strength of the ineffective assistance of trial counsel claim described above establishes at least a "reasonable probability" that "the result of the proceeding would have been different," had appellate counsel raised it.  *Id.* at 694.  I cannot conclude that fairminded jurists could disagree on this application of clearly established federal law.  Accordingly, the Second Department's rejection of Mr. Caballero's ineffective assistance of appellate counsel claim on coram nobis was unreasonable within the meaning of 28 U.S.C. § 2254(d)(1), and Mr. Caballero's petition for a writ of habeas corpus is granted on these grounds.

## CONCLUSION

The Queens County Supreme Court unreasonably applied *Strickland* when it denied Mr. Caballero's 440.10 motion, and the Second Department unreasonably applied *Strickland* when it denied Mr. Caballero's application for coram nobis relief. Mr. Caballero's trial counsel was ineffective for his failure to investigate and for committing other prejudicial errors, thus depriving Mr. Caballero of his Sixth Amendment rights. Mr. Caballero's appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel claim in Mr. Caballero's direct appeal and for laboring under a conflict of interest. Accordingly, Mr. Caballero's petition for a writ of habeas corpus is **GRANTED**. Respondent is ordered to release Mr. Caballero from custody unless the state provides him with a new trial within ninety days of the date of entry of this order. The order is stayed pending appeal on the condition that, within ten days of the date of this order, respondent files a notice of appeal and a motion for an expedited schedule for the prosecution of the appeal.

**SO ORDERED.**

Brooklyn, New York
September 18, 2024

*Edward R. Korman*
Edward R. Korman
United States District Judge